## TRAVELERS' INS. CO. v. SELDEN.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

No. 179.

ACCIDENT INSURANCE—"BODILY INFIRMITIES"—APOPLEXY.

The T. Ins. Co. issued an accident policy to one S., insuring him against death resulting through external, violent, and accidental means, but not covering death resulting wholly or partly, directly or indirectly, from disease or bodily infirmity, or voluntary overexertion. S., a man 53 years of age, while engaged in work which required stooping, and shortly after running rapidly up a hillside, to get an article needed in his work, was attacked with pains in his head, and shortly after died. On the trial of an action on the policy, two physicians, called by the plaintiff, testified that S. died of apoplexy, which is a bodily infirmity or disease, and that there was nothing in the circumstances to have caused death if there had been no bodily infirmity or predisposition to apoplexy. *Held*, that it was error to refuse to direct a verdict for the defendant.

In Error to the Circuit Court of the United States for the Eastern District of Virginia.

J. Alston Cabell and Patrick H. C. Cabell, for plaintiff in error.
Barton H. Wise and John S. Wise, for defendant in error.

Before GOFF, Circuit Judge, and MORRIS and BRAWLEY, District Judges.

BRAWLEY, District Judge. The policy of insurance on which this action is based is on its face called an "accident policy," and contains the covenant of the Travelers' Insurance Company to pay a stipulated indemnity to Richard C. Selden for loss of time "resulting from bodily injuries effected during the term of this insurance through external, violent, and accidental means, which shall, independently of all other causes, immediately and wholly disable him from transacting any and every kind of business." It also contained a covenant to pay $5,000 to his wife or legal representative if death results from such injuries alone, with a proviso that the company should not be liable in case of accident or death resulting, wholly or partly, directly or indirectly, from disease or bodily infirmity, or voluntary overexertion, nor for injuries of which there was no visible mark on the body. The policy was issued on the 22d of March, 1895. The insured died on the 23d of April, 1895, and this is an action of assumpsit on the policy, resulting in a verdict for the plaintiff for $5,000, with interest, and the case is before us on a writ of error.

Various exceptions were taken to the charge of the presiding judge, and to his refusals to charge as requested, but the conclusion reached by us renders it unnecessary to consider them in detail.

The testimony shows that, on the morning of April 19th, the deceased, a farmer, residing on his plantation, went to his barnyard for the purpose of castrating a colt; that he was apparently in his usual health, which is described as that of a vigorous, hardy man, somewhat fleshy, about 53 years of age, and accustomed to lead an active life; that upon his arrival at the barn the colt was seized by some of the men employed on the farm, and thrown down; that Selden thereupon tied him, and proceeded to castrate him; and that, after removing one of the seeds, it was found that the iron used in burning the part was too cold for the purpose, whereupon Selden got up from his stooping posture, ran rapidly up a little hillside, to a fire, where he heated the iron, and ran back to where the colt was lying, when he stooped over, burned the place, and applied the grease, and proceeded to remove the other seed. Before the operation was entirely finished, he showed signs of distress, threw his hand up over his eye, and exclaimed, "I have a fearful pain over my eye," and, as he was about falling over on the colt, he was caught by the attendants, and carried to the barn steps, having lost the use of one of his legs and becoming very sick. After reaching the barn, he put his hand to his head, and said to one of the men, "John, this is the last of me." He was soon removed to his house in a buggy, put to bed, and a physician was summoned. Two physicians attended him until death, on the 23d, and the certificates of both state that he died of apoplexy. The testimony shows that, in going from the colt to the fire, deceased passed over a rough, rocky piece of ground, on which corncobs were scattered in places; but there is no proof that he stumbled or fell, either going or returning. One of the attending physicians was examined at the trial, and testified that the deceased died from a well-defined case of apoplexy, which he defined to be the rupture of a blood vessel on the brain, and that the same was regarded by medical writers and the profession as a bodily infirmity or disease. He further gave it as his opinion, after hearing the witnesses detail the occurrences on the 19th of April, that there was not enough in those circumstances to have caused death, had there not been some bodily infirmity, or the existence of disease, or predisposition to apoplexy. The certificate of the other attending physician, who was the family physician of the deceased, was also offered in evidence by the plaintiff. It is to the effect that he was called in on the 19th of April, and found Mr. Selden critically ill; that he called another physician in to consultation (the same as was examined at the trial); that he was with him day and night until his death; that he died of apoplexy; that there was no history of injury, and no signs of any; and that no post mortem was held. The defendant company offered no testimony, and upon the conclusion of the plaintiff's case duly moved the court to direct a verdict. This motion, which is in the nature of a demurrer to the evidence, is in

accordance with the practice in this jurisdiction, and it is now to be considered whether, under the circumstances of this case, it should have been granted.

"It is the settled law of this court," says Mr. Justice Gray, in Randall v. Railroad Co., 109 U. S. 482, 3 Sup. Ct. 324, "that when the evidence given at the trial, with all the inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant." Other cases of equally high authority declare that it is not only the right, but the duty, of the court, if the evidence is such as not to warrant a verdict for a party, to direct the jury accordingly, and that in every case, before the evidence is left to the jury, there is a preliminary question to be decided by the judge whether there is any evidence produced by the party upon whom the onus of proof is imposed on which the jury can properly proceed to find a verdict for the party introducing it. The legal sufficiency of the evidence to support the verdict presents a question of law, the decision of which is not a matter of discretion, but of duty, and is as much the subject of exception and review as any other ruling of the court in the course of the trial. In all cases where there is conflict of testimony, or question as to the credibility of witnesses and preponderance of proof, and in actions of negligence, where the line which separates questions of law from questions of fact is so close that it cannot be accurately delimited, and minds equally intelligent and equally impartial might draw different conclusions, the judgment of 12 impartial men, of the average of the community, applying their separate experiences of life to the solution of such doubts as may arise, is more likely to be wise and safe than the conclusion of any single judge, and the practice is not to be encouraged which would substitute the conclusions of one mind for that average judgment which it is the object of our system of jurisprudence to obtain in all proper cases. But where there is a simple question of contract or its breach, and the facts are undisputed, it must be ruled as a question of law; for the rights of parties in such cases must be decided according to the law of the land as expounded by the courts, and cannot be left to the arbitrary determination of a jury, which may adopt theories without proof, substitute possibilities for facts, and conjectures for evidence. Judges are no more free from the weaknesses of human nature than are jurors, but where responsibility is diffused the obligation of duty seems to rest more lightly upon the individual than where it is concentrated, and the pleadings of sympathy or the promptings of prejudice or passion are ofttimes likely to produce that result on a jury which it is the special and highest duty of the judge to prevent.

The case under consideration was simply one of contract. Had the policy of insurance been an ordinary life policy, the right to recovery was plain; but it is the duty of courts to enforce contracts as made, and not to make, or allow to be made, new contracts between the parties. The contract was what is known as, and what

on its face and in its terms it purported to be, an "accident policy," and the defendant corporation covenanted to pay the sum of money named if death resulted from bodily injuries through "external, violent, and accidental means alone, independently of all other causes," and it was expressly stipulated that it should "not cover injuries of which there is no visible mark, nor death resulting wholly or partly, directly or indirectly, from disease or bodily infirmity," or from "voluntary overexertion." In an etymological sense anything that happens may be said to be an "accident," but, in the sense in which the word is used in this policy, as shown by the context, and as expounded in similar cases, it is to be taken as meaning "an event which proceeds from an unknown cause, or as an unusual effect of a known cause, and therefore unexpected,"—something casual and fortuitous. To entitle the plaintiff below to recover, the burden of proof was upon her, not only to show that the deceased came to his death through "external, violent, and accidental means alone," but also to show that the death was not due, in whole or in part, directly or indirectly, to disease or bodily infirmity. There was not only no proof of any accident, but conclusive evidence, from the only medical witnesses examined, that death was due to disease. If, during the operation upon the colt, while running to the fire for the hot iron, the deceased had stumbled or fell, that might have been considered an accident; but there was nothing of the kind. At most, it might be contended that the exertions and activities of that morning tended to bring into activity a then existing but dormant disorder; but "voluntary overexertion," and disease and bodily infirmity, are in express words not insured against.

There was not only no evidence that the death was caused by external, violent, and accidental means, but conclusive evidence to the contrary. The only medical testimony as to the cause of death was that of Dr. Michaux, who swore that the deceased died of apoplexy, and that there was nothing in the circumstances detailed sufficient to cause death without a previously existing disease. He was a witness put upon the stand by the plaintiff, and there was no evidence to contradict him. Where the weight of credible testimony proves the existence of a fact, it must be accepted as a fact. Where an event occurs which can be readily explained as an operation of nature, working through natural, usual, and ordinary laws, that cannot be called an accident; nor can conjectures be allowed to displace proofs. Most modern writers apply the term "apoplexy" to cerebral hemorrhages. It is a well-defined disease,—as well understood as pneumonia. It is a disease to which men of the age of the deceased are most peculiarly subject. Hippocrates states that it is of most frequent occurrence between the ages of 40 and 60, and all medical experience confirms the truth of this observation, and the reason is obvious, for the blood vessels of the brain are liable to undergo degenerative changes after middle life. The texture becoming fragile, their function in carrying on the healthy nutrition of the brain is impaired, and, being liable to give way, the blood escapes into the brain. If the hemorrhage is slight in amount, and in that part of the brain where its presence

gives rise to little disturbance, the effused blood undergoes gradual absorption, and a certain measure of recovery takes place, while, if a large vessel is ruptured, and blood extravasated in or around the important structures at the base of the brain, death is likely to follow within a short period. Severe exertion of mind or body, much stooping, anything, in fact, which tends, directly or indirectly, to increase the tension within the cerebral blood vessels, may bring on an attack. When a man with delicate lungs exposes his breast unprotected to the wintry blast, you could as well attribute the pneumonia and death which may ensue to accident, as you could the stroke of apoplexy which follows when a man over 50 years of age engages in an operation which demands violent exertion and much stooping. In either case a man in the full vigor of youth and manhood might pass the ordeal unscathed; in both, death is due, directly or indirectly, to bodily infirmity.

Not only is there an entire absence of proof of any accident likely or sufficient to cause death in this case, but positive proof that death was due to disease, and no conflicting testimony whatever. What question, therefore, was there which could properly go to the jury? In Barry's Case, 131 U. S. 100, 9 Sup. Ct. 755, relied upon by the defendant in error, there was proof that the deceased jumped from a platform four or five feet high, alighting so heavily as to attract the attention of his companions, and was hurt; that he became ill on his way home, and much conflicting testimony as to the cause of his death, as to whether it resulted from duodenitis, or a stricture of the duodenum, caused by the jump. There being a conflict of testimony as to the cause of death, such a question was properly submitted to the jury. In Burrough's Case, 69 Pa. St. 51, there was conflicting testimony as to whether deceased received a blow upon the abdomen from a pitchfork, causing internal injuries, or whether death was due to a strain. The court held that an accidental strain, resulting in death, was an accidental injury, within the meaning of the policy; that being an unexpected event, happening by chance, and not occurring according to the usual course of things. In Martin's Case, 1 Fost. & F. 505, it was held that an injury to the spine, caused by the lifting of a heavy burden, was within the meaning of the policy, which was against any bodily injury occasioned by any external or material cause operating on the person of the insured.

It is unnecessary to cite the numerous and familiar cases which declare it to be the duty of the court to direct a verdict when the evidence is undisputed, or is of such conclusive character that the court would, in the exercise of a sound judicial discretion, be compelled to set aside a verdict rendered in opposition to it. In Improvement Co. v. Munson, 14 Wall. 448, Mr. Justice Clifford says:

"Formerly it was held that if there was what is called a 'scintilla' of evidence in support of a case, the judge was bound to leave it to the jury; but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it upon which the onus of proof is imposed."

78 F.—19

"Such is the constant practice," says Mr. Justice Swayne, in Bow-ditch v. Boston, 101 U. S. 16, because "it gives scientific certainty to the law in its application to the facts, and promotes the ends of justice." The court cannot allow the jury to assume the truth of any material fact without some evidence legally sufficient to establish it, and the jury cannot legally infer the existence of a material fact unless there is some proof of it. "The truth of the facts and circumstances offered in evidence in support of the allegations on the record must be determined by the jury. But it is for the court to decide whether or not those facts and circumstances, if found by the jury to be true, are sufficient, in point of law, to maintain the allegations in the pleadings." Railroad Co. v. Woodson, 134 U. S. 622, 10 Sup. Ct. 630. It therefore follows that, when the facts and circumstances are admitted and undisputed, it becomes a question of law for the court to decide whether they support the averments of the pleadings, and it is error to leave a question of law to the arbitrary determination of a jury, for everybody knows that a case of this kind can have but one result if left to a jury, moved, as it must be, by the natural and creditable instincts of human nature, to sympathize with the afflicted. No case can be conceived which more strongly invokes the obligation to duty imposed upon the courts as set forth in the oft-quoted language of Mr. Justice Miller, in Pleasants v. Fant, 22 Wall. 116:

"It is the duty of the court, in its relation to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial."

That the contract between the parties in this case, if decided by the rules of law, and not determined by the sympathies of the jury, would have had another result, finds apt illustration in the case cited in the brief, Mary M. Selden v. American etc., Insurance Co., where Mr. Commissioner Guy, in a carefully considered report, which was confirmed by the circuit court of the city of Richmond, reaches the conclusion that there was no liability upon a similar policy.

The judgment of the court below is reversed.