### NORTHERN PAC. RY. CO. v. TRIPP.

(Circuit Court of Appeals, Eighth Circuit. January 4, 1915.)

No. 4238.

RAILROADS ⬡⟼327—CROSSING ACCIDENTS—CONTRIBUTORY NEGLIGENCE—FAILURE TO LOOK.

An automobile driver, driving five miles an hour, whose view of the main track of a railroad east of a crossing was obstructed wholly or partly until he was within 43 feet of such main track, and whose brakes and appliances were in good working order, and who could have stopped his automobile by customary methods in less than 5 feet, was guilty of contributory negligence as a matter of law in failing to look towards the east while driving such distance of 43 feet.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1043–1056; Dec. Dig. ⬡⟼327.]

In Error to the District Court of the United States for the District of North Dakota; Charles F. Amidon, Judge.

Action by L. A. Tripp against the Northern Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Reversed, and new trial granted.

E. T. Conmy, of Fargo, N. D. (C. W. Bunn, of St. Paul, Minn., and Watson & Young, of Fargo, N. D., on the brief), for plaintiff in error

Arthur W. Fowler, of Fargo, N. D., for defendant in error.

⬡⟼For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before CARLAND, Circuit Judge, and T. C. MUNGER and YOU-MANS, District Judges.

T. C. MUNGER, District Judge. The defendant in error had a verdict and judgment against the plaintiff in error in an action for negligence. For convenience the parties will hereafter be referred to as plaintiff and defendant, as they appeared in the trial court.

At the town of Sheldon, N. D., the defendant maintained four railway tracks running east and west over a public highway which crossed the tracks at right angles thereto. The center of the most southerly of the tracks, called the "house track," was 13 feet from the center of the track next north, called the "passing track," and from the center of the passing track to the center of the next track to the north, called the "main track," was 35 feet and 2 inches. The fourth track was about 45 feet north of the north rail of the main track, but its location is not of importance in this suit.

A portion of the business section of Sheldon was situated just north of these tracks, but elevators, a hotel, and many other buildings were situated south of the tracks. Just south of the house track the highway curved sharply to the west across a sidewalk, and then turned again to the south in front of a hotel, which was about 100 feet south of the house track. The main track as it approached the highway from the east had a slight downgrade, and the grade of the highway rose about 3 inches to the foot from the passing to the main track.

The plaintiff was in the livery business at a neighboring town, had owned and used automobiles for several years, and owned and was operating the one in which he was at the time of the accident. He frequently passed over this crossing, and had crossed it going south with some passengers but a few minutes before he was injured. The accident occurred about 10 o'clock in the forenoon of a bright July day. The plaintiff, after discharging his passengers at the hotel, had started his automobile north, and about 15 feet west of the sidewalk he had turned to the east, and continued eastward till he had crossed the sidewalk, when, following the curve in the road, he drove in a northeasterly direction about 68 feet to the first crossing, and thence north to the main track, where a passing train from the east struck his automobile and caused his injuries. That there is sufficient evidence of the defendant's negligence as to the speed of the train and the failure to give proper warning by bell or whistle is not disputed; but it is contended that the undisputed evidence shows plaintiff's contributory negligence, because he failed to use proper care to look and listen for approaching trains. The plaintiff testified that he looked to the east for a train, when his automobile started east at the point 15 feet west of the sidewalk. At this point his view was somewhat obstructed by two box cars, one on the house track 43½ feet east of the crossing, and one on the passing track 475 feet east of the crossing and by a pile of cordwood, lumber, a coal shed, and a grain elevator situated along the south side of the passing track; but he could see over a section of the main track at a distance of 700 or 800 feet, and he says he saw no train approaching. His view further east than 800 feet was entirely obstructed by the coal shed and elevator.

Plaintiff then drove 68½ feet from the sidewalk around the curved road to the center of the crossing over the house track and 48 feet further to the main track. After his view was unobstructed by the box car on the house track, and after passing the north rail of the house track, he had a distance to go before reaching the nearer rail of the main track of 43 feet, and from any point along this distance of 43 feet his view to the east along the main track was unobstructed, and he could see an approaching train for at least 800 feet. He did not look in this direction after passing the obstruction of the box car. He testifies that his automobile did not travel in excess of 5 miles per hour, and that he was looking to the west from the time he was on the house track until he had gone 30 or 40 feet, and meanwhile he was listening for the approach of a train, but he did not still the noise of his automobile. His view was cut off to the west, until he passed the house track, by an elevator and a box car, and to some extent thereafter by a coalhouse and trees between the passing and main tracks. He heard the rumbling of the approaching train when he was about half way between the passing and main tracks, and in some excitement then attempted to drive on over the main track. The plaintiff had had experience as a railroad man, having spent 15 years as a brakeman and freight and passenger conductor.

If the plaintiff were traveling at 5 miles per hour, and had a distance to go of 116 feet before he reached the main track, a train running at 35 miles an hour would cover the 800 feet that is admitted to have been the limit of his vision down the main track, and be upon the crossing at the same time he would reach it; and one running at a less speed would be in such proximity as to make a crossing dangerous, such as men of ordinary prudence would not hazard.

The brakes and appliances of plaintiff's automobile were in good working order, and the undisputed testimony is that he could have stopped it by the customary methods in less than 5 feet at any time after he passed the obstruction of the box car on the house track. For the distance of 43 feet in which he had a clear view to the east after passing that car, he was master of his movements, with an ample factor of safety. If the speed at which he was driving was such that he had not enough time to look in both directions along the railway track, reasonable care required that he should control that speed until his safety could be assured. If one traveling in an automobile at 5 miles per hour may continue toward a railway track for a distance of 43 feet after passing an obstruction without looking in each direction, then one traveling in such a vehicle at 25 miles per hour need not look out for a distance of 235 feet, and a pedestrian walking at the not unusual rate of 3 miles per hour would be authorized to travel 25 feet while having opportunity for a clear view and neglecting it.

In the case of Chicago Great Western Ry. Co. v. Smith, 141 Fed. 930, 73 C. C. A. 164, the person injured was walking across railway tracks, and after passing a "dead engine" on one track had but 7 feet to go to the next track; but a failure to look while going that distance was held fatal to recovery by this court. It was said:

"These facts permit of no other conclusion than that the deceased went upon the coal track without taking the precautions necessary to determine

whether he could do so in safety. This was negligence. The place was one of great danger, and the track was itself a warning. As was said in Elliott v. Chicago, etc., Ry. Co., 150 U. S. 245, 248, 14 Sup. Ct. 85, 86, 37 L. Ed. 1068: 'It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom.' The law requires of one going into so dangerous a place the vigilant exercise of his faculties of sight and hearing at such short distance therefrom as will be effectual for his protection, and if this duty is neglected, and injury results, there can be no recovery, although the injury would not have occurred, but for the negligence of others."

In the case of Horan v. Boston & M. R. R., 183 Fed. 559, 106 C. C. A. 535, one walking 15 feet to a railway track after having looked and listened and without looking again was held guilty of contributory negligence. A similar rule was applied to the driver of vehicles in the case of Pyle v. Clark, 79 Fed. 744, 25 C. C. A. 190, where the driver of a team had stopped 15 to 25 feet from the railway track and looked in both directions before driving forward. This court said:

"Pyle was the driver of the team, and he was responsible for its movements. He was sitting on the north side of the wagon, on the side from which the train that collided with his wagon approached. His view of the track on which it came was unobstructed for 2,000 feet. His horses were not afraid of the cars, and they were standing still from 15 to 25 feet from the track. He sat quietly in his wagon for a minute after he looked to the north, and then, without looking north again, he drove slowly upon the track, and the engine coming from that direction caught him. His failure to use his eyes diligently, his failure to look to the north for an entire minute before he drove upon the track, and his act of starting his horses forward upon it, without glancing alternately in each direction, were acts of gross negligence. If he had not been guilty of them, the accident could not have happened. If he had not driven his horses upon the track in front of the approaching engine, there would have been no collision; and if he had looked to the north immediately before he drove them forward, he would never have done so. Upon this state of facts, there was no escape from the conclusion that the negligence of Pyle was the proximate cause of the collision."

See, also, Chicago, M. & St. P. Ry. Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309; and note in 37 L. R. A. (N. S.) 139.

The same reasons that require pedestrians and drivers of other vehicles to subordinate their desire to continue at a fixed rate of speed to the prudent use of their senses to discover an approaching train apply to the drivers of automobiles. As was remarked in New York Cent. & H. R. R. Co. v. Maidment, 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794:

"With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have and will continue to arise. At no place are those relations more important than at the grade crossings of railroads. The main consideration hitherto with reference to such crossings has been the danger to those crossing. A ponderous, swiftly moving locomotive, followed by a heavy train, is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train. And when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger. On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety. When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject. He cannot drive close to the track, or

stop there, without risk of his horse frightening, shying, or overturning his vehicle. He cannot well leave his horse standing, and if he goes forward to the track to get an unobstructed view and look for coming trains he might have to lead his horse or team with him. These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse. It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law, both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public. If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized. In the case of trolleys crossing railroads at grade, the practice is general for the conductor to go ahead and from the track signal the halted car to advance. This would, of course, be impracticable as a rule for automobiles; but it illustrates the trend of the law, as the size of crossing vehicles makes collision with them more serious, to enforce greater safety precautions."

See, also, Brommer v. Pennsylvania R. Co., 179 Fed. 577, 103 C. C. A. 135, 29 L. R. A. (N. S.) 924.

In the present case the evidence is undisputed that the plaintiff was advised that his vision was limited at the time he looked to the east. He knew that it would grow more so until he approached the crossing over the house track, where it would be entirely cut off by the box car to the east. After he passed this obstruction he looked constantly to the west, where obstructions prevented effective vision, and he was aware that he had not looked again to the east, and so continued until he reached the final danger point. The obstruction to the west, instead of being an excuse, was a warning, not only that he was in danger from that direction, but also from the opposite direction, because of his lack of attention there. Under such circumstances, his duty was plain. He should have taken time in which to glance in the opposite direction, where the slightest glance would have shown his danger, or he should have exercised his control over his vehicle, so that he could listen for approaching trains, or have stopped it, if necessary, until he could use his senses of sight and hearing, and the failure to do so was negligence on his part. Chicago & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 64 C. C. A. 399; Chicago, R. I. & P. Ry. Co. v. Pounds, 82 Fed. 217, 27 C. C. A. 112; Grimsley v. Northern Pac. Ry. Co., 187 Fed. 587, 109 C. C. A. 417; Chicago, M. & St. P. Ry. Co. v. Bennett, 181 Fed. 799, 104 C. C. A. 309; Chicago, B. & Q. R. Co. v. Munger, 168 Fed. 690, 94 C. C. A. 176; Davis v. Chicago, R. I. & P. Ry. Co., 159 Fed. 10, 88 C. C. A. 488, 16 L. R. A. 424.

The motion for a directed verdict should have been sustained, on the ground that the evidence showed contributory negligence on the part of the plaintiff, and the judgment must accordingly be reversed, and a new trial granted.