## DERNBERGER v. BALTIMORE & O. R. CO.

### (District Court, N. D. West Virginia. July 31, 1916.)

1. NEGLIGENCE ☞136(7)—PROVINCE OF COURT AND JURY—DIRECTED VERDICT.
   Where the evidence is such that a verdict based thereon would be set aside, it is proper for the trial court, particularly in negligence actions, to direct a verdict for defendant; the scintilla rule not prevailing.

   [Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 287, 288; Dec. Dig. ☞136(7).]

2. RAILROADS ☞301—CROSSINGS—CARE.
   While a railroad company's right to use its tracks at highway crossings is superior to that of the public, it owes travelers the duty of exercising due care for their safety, while travelers have the reciprocal duty of exercising care for their own safety.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 956; Dec. Dig. ☞301.]

3. RAILROADS ☞335(3)—CROSSING ACCIDENTS—DEFENSES.
   The failure of a railroad company to comply with statutes requiring the ringing of bells and blowing of whistles before reaching a highway crossing furnishes no basis for recovery by one injured at such crossing, where the injured person was guilty of contributory negligence.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1087; Dec. Dig. ☞335(3).]

4. RAILROADS ☞307(7)—OPERATION—CARE.
   That state statutes require a railroad company to take specified precautions as the blowing of whistles and ringing of bells before reaching a highway crossing does not excuse the company from exercising care commensurate with the danger at the crossing, which is to be measured by the amount of travel at such crossing.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 980; Dec. Dig. ☞307(7).]

5. RAILROADS ☞335(1)—CROSSING—ACCIDENTS—CONTRIBUTORY NEGLIGENCE.
   A traveler, injured in a crossing accident, cannot recover, where he failed to exercise due care for his own safety, regardless of the negligence of the railroad company.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1084; Dec. Dig. ☞335(1).]

6. COURTS ☞96(1)—PRECEDENTS—DECISIONS.
   A decision by the Circuit Court of Appeals sitting for a particular district is binding on the District Courts therein.

   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 327, 334; Dec. Dig. ☞96(1).]

7. RAILROADS ☞327(8)—CROSSING ACCIDENTS—CARE—STOP, LOOK, AND LISTEN.
   A railroad track is a warning of danger, and it is the duty of a traveler, approaching a crossing that is obstructed, to stop, look, and listen at a point close enough to the track to ascertain the approach of trains; therefore, where a traveler stopped over 150 feet away from the track, and then at a slow pace drove thereon, and was struck by a train and killed, no recovery can be had.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1051; Dec. Dig. ☞327(8).]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by Martha Dernberger, administratrix, against the Baltimore & Ohio Railroad Company. A verdict was directed for defendant, and plaintiff moves for new trial. Motion denied.

R. E. Bills, C. M. Hanna, and Reese Blizzard, all of Parkersburg, W. Va., for plaintiff.

James W. Vandervort and B. M. Ambler, both of Parkersburg, W. Va., for defendant.

DAYTON, District Judge. Upon the trial of this case, I felt, under the law, in duty bound to sustain the defendant's motion and direct a verdict for it. Motion has been made to set aside this verdict and grant plaintiff a new trial, and it is this motion I am now to pass upon. As matter of introduction it seems proper to review, to a limited extent, the authorities enunciating the rule governing federal courts in determining when a verdict should be directed by the court and when the matter should be submitted to the jury. Such review is constantly necessary, because the great number of these negligence cases arising in our courts and constantly increasing—cases always appealing to a greater or lesser degree to our human sympathies—makes the temptation a constant one for judges to shirk the grave responsibility imposed upon them by the law in this particular, and allow the jury to do its will.

[1] In Commissioners, etc., v. Clark, 94 U. S. 278, at page 284, 24 L. Ed. 59, Mr. Justice Clifford says:

"Decided cases may be found where it is held that, if there is a scintilla of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule, to wit, that, before the evidence is left to the jury, there is or may be in every case a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed."

In Meguire v. Corwine, 101 U. S. 108, at page 111, 25 L. Ed. 899, Mr. Justice Swayne says:

"A judge has no right to submit a question where the state of the evidence forbids it."

And again, in Bowditch v. Boston, 101 U. S. 16, at page 18, 25 L. Ed. 980, he says:

"It is now a settled rule in the courts of the United States that whenever, in the trial of a civil case, it is clear that the state of the evidence is such as not to warrant a verdict for a party, and that if such verdict were rendered the other party would be entitled to a new trial, it is the right and duty of the judge to direct the jury to find according to the views of the court. Such is the constant practice, and it is a convenient one. It saves * * * expense. It gives scientific certainty to the law in its application to the facts and promotes the ends of justice. Merchants' Bank v. State Bank, 10 Wall. 604, 637 [19 L. Ed. 1008]; Improvement Company v. Munson, 14 Wall. 442 [20 L. Ed. 867]; Pleasants v. Fant, 22 Wall. 116 [22 L. Ed. 780]."

This proposition is affirmed in Anderson v. Beal, 113 U. S. 227, 241, 5 Sup. Ct. 433, 28 L. Ed. 966, and Arthur v. Cumming, 91 U. S. 362, 365, 23 L. Ed. 438; In Delaware, etc., R. R. Co. v. Converse,

139 U. S. at page 472, 11 Sup. Ct. at page 570, 35 L. Ed. 213, Mr. Justice Harlan says:

"But it is well settled that the court may withdraw a case from them altogether and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it. Phœnix Ins. Co. v. Doster, 106 U. S. 30, 32 [1 Sup. Ct. 18, 27 L. Ed. 65]; Griggs v. Houston, 104 U. S. 553 [26 L. Ed. 840]; Randall v. Baltimore & Ohio Railroad, 109 U. S. 478, 482 [3 Sup. Ct. 322, 27 L. Ed. 1003]; Anderson Co. Commissioners v. Beal, 113 U. S. 227, 241 [5 Sup. Ct. 433, 28 L. Ed. 966]; Schofield v. C. & St. P. Ry. Co., 114 U. S. 615, 618 [5 Sup. Ct. 1125, 29 L. Ed. 224.] 'It would be an idle proceeding,' this court said in North Penn. Railroad v. Commercial Bank, 123 U. S. 727, 733 [8 Sup. Ct. 266, 31 L. Ed. 287], 'to submit the evidence to the jury when they could justly find only in one way.'"

In Patton v. Texas & Pacific Ry. Co., 179 U. S. at page 660, 21 Sup. Ct. at page 276, 45 L. Ed. 361, Mr. Justice Brewer quoting this last passage, states "that cases are not to be lightly taken from the jury," but adds:

"At the same time the judge is primarily responsible for the just outcome of the trial. He is not a mere moderator of a town meeting, submitting questions to the jury for determination, nor simply ruling on the admissibility of testimony, but one who in our jurisprudence stands charged with full responsibility."

There has been no modification of these principles in the recent cases. District of Columbia v. Moulton, 182 U. S. 576, 582, 21 Sup. Ct. 840, 45 L. Ed. 1237; McGuire v. Blount, 199 U. S. 142, 148, 26 Sup. Ct. 1, 50 L. Ed. 125; Empire State Cattle Co. v. Atchison Ry. Co., 210 U. S. 1, 10, 28 Sup. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70; Hepner v. United States, 213 U. S. 103, 112, 53 L. Ed. 720, 27 L. R. A. (N. S.) 739, 16 Ann. Cas. 960. In this last case the Supreme Court applies the rule in an action brought by the government to enforce a statutory penalty and sustained a directed verdict for the plaintiff. The application of this rule to negligence cases has been many times reiterated. Patton v. T. & P. Ry. Co., 179 U. S. 658, 659, 21 Sup. Ct. 275, 45 L. Ed. 361; Southern Pacific Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 339, 40 L. Ed. 485, where it is said:

"There can be no doubt, where evidence is conflicting, that it is the province of the jury to determine, from such evidence, the proof which constitutes negligence. There is also no doubt, where the facts are undisputed or clearly preponderant, that the question of negligence is one of law. Union Pacific Railway Company v. McDonald, 152 U. S. 262, 283 [14 Sup. Ct. 619, 627, 38 L. Ed. 434]. The rule is thus announced in that case: 'Upon the question of negligence * * * the court may withdraw a case from the jury altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it.' Delaware, Lackawanna, etc., Railroad v. Converse, 139 U. S. 469, 472 [11 Sup. Ct. 569, 35 L. Ed. 213] and authorities there cited; Elliott v. Chicago, Milwaukee & St. Paul Railway, 150 U. S. 245 [14 Sup. Ct. 85, 37 L. Ed. 1068]; Anderson County Com'rs v. Beal, 113 U. S. 227, 241 [5 Sup. Ct. 433, 28 L. Ed. 966]."

The law, sound reason, and common experience point out that there is peculiar necessity for the enforcement of this rule in negligence cas-

es. The law's recognition of this fact cannot be better stated than it has been by the Circuit Court of Appeals for this Fourth Circuit, speaking through Judge Brawley, in Travelers' Ins. Co. v. Selden, 78 Fed. 285, 290, 24 C. C. A. 92, 96, as follows:

" 'Such is the constant practice,' says Justice Swayne in Bowditch v. Boston, 101 U. S. 16 [25. L. Ed. 980], because 'it gives scientific certainty to the law in its application to the facts, and promotes the ends of justice.' The court cannot allow the jury to assume the truth of any material fact without some evidence legally sufficient to establish it, and the jury cannot legally infer the existence of a material fact unless there is some proof of it. The truth of the facts and circumstances offered in evidence in support of the allegations on the record must be determined by the jury. But it is for the court to decide whether or not those facts and circumstances, if found by the jury to be true, are sufficient, in point of law, to maintain the allegations in the pleadings.' Railroad Co. v. Woodson, 134 U. S. 622, 10 Sup. Ct. 630 [33 L. Ed. 1032]. It therefore follows that, when the facts and circumstances are admitted and undisputed, it becomes a question of law for the court to decide whether they support the averments of the pleadings, *and it is error to leave a question of law to the arbitrary determination of a jury*, for everybody knows that a case of this kind can have but one result if left to a jury, moved, as it must be, by the natural and creditable instincts of human nature, to sympathize with the afflicted. No case can be conceived which more strongly invokes the obligation to duty imposed upon the courts as set forth in the oft-quoted language of Mr. Justice Miller in Pleasants v. Fant, 22 Wall. 116 [22 L. Ed. 780]: 'It is the duty of the court, in its relation to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial.' "

The Circuit Court of Appeals for the Eighth Circuit, in Midland Valley R. Co. v. Fulgham, 104 C. C. A. 151, 181 Fed. 91, has felt compelled, apparently from its experience in these negligence cases, to condemn what is a very general weakness in jury deliberation, when it says:

"Conjecture is an unsound and unjust foundation for a verdict. Juries may not legally guess the money or property of one litigant to another. Substantial evidence of the facts which constitute the cause of action * * * is indispensable to the maintenance of a verdict sustaining it."

The statement has been made above that sound reason and common experience indicate a peculiar necessity for the enforcement of this rule in negligence cases. This statement is made advisedly, after long and earnest study of existing conditions. Courts must enforce the law as it is, not as they would have it be. Inferior courts must take the legal precepts as they come from the legislative enactments and the decisions of courts of last resort, made by law, binding upon them. None of us can help but deplore the fact that our Legislatures, for example, do not require counties and municipalities, in conjunction with railroads, to, make all railroad crossings either overhead or underneath street and road ones, so that deplorable accidents such as the one in this case would be impossible. No such provision has been made, and we must, in the discharge of our duty, recognize and enforce the reciprocal rights existing by the law, as it is, between railroads and the traveler on the highway. In the practical enforcement of the law in negligence cases, certain psychological conditions exist that do not exist in the trial of other cases, or, at least, exist in a much more accentuated and acute degree. Some one has been injured, has endured

pain, has in case of death been deprived of the association, support, and affection of a near relative. Human nature at once calls forth regret and sympathy from court, counsel, jury; and all those who may hear the fact of there having been such accident. In most cases three distinct classes are involved: First, the plaintiff, who has suffered; second, the impersonal corporation; and, third, the latter's employé or employés by whose alleged negligence the injury resulted. If a corporation, as is usually the case, the defendant in the mind of average jurors is conceived to be endowed with large wealth and with unusual potentialities to defend and litigate, while the plaintiff is a personality, poor and helpless, and deprived, to a degree at least, of his original means of caring for himself.

In the trial of the case, it takes a degree of self-restraint, hard to obtain in jurors, and more or less in judges, too, necessary to prevent them from unconsciously determining to help and decide for the injured plaintiff, if any excuse can be found for so doing. The appeal to self-interest, "to put yourself in his place," is strong. The practical result in many, if not most, cases is that the legal relations of the parties are reversed. The defendant, instead of being entitled to have his negligence affirmatively shown, is put to it to show that, in all particulars, he has been free from it, and no excuse can be found to sustain the charge of it against him. The thousands of cases tried in our courts bring home to us the full conviction that juries go farther, and feel that it can hardly be expected of them to understand the fine and minute distinctions as to the legal principles, governing this class of cases, so often embodied in instructions and charges given by the court, and, if the court submits such a case to them at all, instead of deciding it himself by a directed verdict, that the only duty for them to perform is to ascertain the damages, and let the defendant corporation see if it can get from under by its motion for new trial or upon writ of error. Practically little or no weight, too often, is given to the evidence of the defendant's employés whose personal conduct is in question in the case. It seems as if juries assume, as a matter of course, that such employés testify disingenuously, if not falsely, under compulsion and fear of losing their jobs, and that anyhow, if they had been the ones hurt, they, too, would be suing and expecting to recover damages. In short, it matters little how often the courts may charge the simple, sound legal proposition that the fact that an accident has occurred carries with it no presumption of liability, juries will, in most cases, repudiate it and feel that it would be cruel, on their part, to deny the victim something.

Under the common law, prudence and care were made a matter of personal concern. If the operating individual employé was so negligent as to cause the death of another, he was guilty of involuntary manslaughter, and prosecuted therefor; if such negligence of his resulted in injury only, he was held for the lesser misdemeanors of assault or trespass. Under modern conditions such prosecutions are almost unheard of; a modern jury that had amerced the employing corporation in damages, it cannot be doubted, would ordinarily promptly acquit the negligent employé from criminal liability. We are to-

day, under the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1913, §§ 8657–8665]), apportioning damages incurred by negligent employés, when injured, according to the extent they were negligent compared with the negligence of their fellow employés. But, under all these advanced ideas, both human and divine law recognizes that the individual, if he be mentally sound, is charged with the primary responsibility of caring for and securing his own personal safety. If, by his own sole fault, he is negligent, and as a result is injured, our law as it exists to-day requires him to suffer the consequences; and if he charges his misfortune to another, he must prove affirmatively and by substantial evidence the negligence of the other, and not leave it "to conjecture, guess, or random judgment" (Sorenson v. Pulp Co., 56 Wis. 338, 14 N. W. 446) of a jury.

"Judges," as well said by Judge Brawley in Insurance Co. v. Selden, supra, "are no more free from weaknesses of human nature than are jurors; but where responsibility is diffused the obligation of duty seems to rest more lightly upon the individual than where it is concentrated, and the pleadings of sympathy or the promptings of prejudice or passion are ofttimes likely to produce that result on a jury which it is the special and highest duty of the judge to prevent."

[2-4] The case here involves an accident at a railroad crossing in which Dernberger lost his life. That the rule we have been considering applies in full force to this class of negligence cases is well established. Elliott v. C., M. & St. P. R. Co., 150 U. S. 245, 249, 14 Sup. Ct. 85, 37 L. Ed. 1068; C., R. I. & P. R. Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542; Schofield v. C., M. & St. P. R. Co., 114 U. S. 615, 618, 5 Sup. Ct. 1125, 29 L. Ed. 224; Northern Pacific Co. v. Freeman, 174 U. S. 379, 19 Sup. Ct. 763, 43 L. Ed. 1014. It was therefore clearly the duty of this court, upon the request of the defendant for an instructed verdict, to make a very close, careful, and, as far as possible, accurate, analysis of the evidence adduced by the plaintiff in support of her claim for damage, and ascertain thereby whether the undisputed facts shown, allowing the most favorable inferences to be drawn therefrom, warranted a recovery under the law; if so, then to require the case on the defendant's part to proceed, and submit it finally to the jury; but, if such recovery was not so warranted under the conditions of this rule, then, no matter how disagreeable from a sympathetic standpoint, it was its duty to direct a verdict for the defendant. And now, having upon the trial reached the latter conclusion, and having so directed the verdict, upon this motion of plaintiff to set aside this verdict and grant her a new trial, if, upon a more careful study and consideration of the law and the evidence, this court should conclude it erred in its ruling, then it should promptly grant the motion, otherwise overrule it.

In negligence cases it is frequently difficult to apply general legal principles, for almost every case presents its own peculiar facts. It may, however, be assumed that crossing cases present as little difficulty in this regard as any others, yet in these a very great diversity of conditions arise from (a) the nature and location of the crossing; (b) the number and location of the railroad tracks; and (c) the method of locomotion resorted to at the time by the person seeking to cross.

Some general legal principles are applicable in all these conditions. The rights and obligations of the railroad company and of the individual in the use of the crossing are recognized as reciprocal. The railroad company's right to use is admitted to be superior, subject to the limitation that such use shall be restricted to the extent of its necessities in the premises under prompt and prudent management. In most of the states, statutes exist requiring warnings to be given by trains approaching crossings. The statute in this state requires the railroad to maintain, under penalty of fine, signboards at each crossing, and, under a like penalty, to cause its fireman or engineer on every locomotive to ring a bell or blow a steam whistle at the distance of at least 60 rods from the place of crossing, for a time sufficient to give due notice of the approach of the train; and failure to do so makes the company liable to any person injured in consequence of such failure. This statute has been construed, as such statutes generally have been, not, however, to excuse a traveler on a highway, crossing a railroad track, from exercise of such reasonable care and caution as the law requires to ascertain whether a train is approaching the crossing. Beyel v. Newport News & M. V. R. Co., 34 W. Va. 538, 12 S. E. 532; Berkeley v. C. & O. Ry. Co., 43 W. Va. 11, 26 S. E. 349. On the other hand, it has been held that neither the Legislature nor railroad commissioners can arbitrarily determine in advance what shall constitute ordinary care or reasonable prudence in a railroad company at a crossing, and therefore the fact that a statute provides for these precautions will not relieve the company from adopting such other measures as public safety and common prudence dictate. Grand Trunk R. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485.

The reason is apparent. When such crossings are situate in large cities, where population is congested and the crossing subjected to constant use, the precautionary measures to be taken by the company, in order to avoid accident, must necessarily be more stringent than at crossings in a small town or borough, where the use is not so great; and yet, under particular conditions, a crossing in such town or borough may require greater care and protection than a country road crossing, little used. In the first instance, that of city crossings, the requirement that the company use gates or station watchmen thereat becomes almost imperative; in small towns and villages, only rare and extraordinary conditions would require such burden to be assumed by the company; at a country roadside crossing, little used, such requirement would be unreasonable and oppressive. But as to the character and necessity of these extra precautions in each instance the company must be allowed to determine, for, in the language of the Supreme Court of Pennsylvania:

"In the operation of its road, and in the running of its cars, the judgment of the board of directors of a railroad company, in the absence of statutory provision, is supreme and exclusive. The public safety imperatively requires that there be no division of this great responsibility with others—not even with municipalities through whose limits railroads may run—for division of it would be the shifting of it in every case of accountability for failure to properly operate the road or run the cars. But, while this is true, corresponding duties of the highest order are imposed exclusively upon those having the control and management of railroads. One of these is to adopt and use ade-

quate means to give notice of approaching trains at grade crossings, which are always more or less dangerous; and failure to perform this duty is negligence, for the consequences of which those are responsible upon whom the duty is imposed. What particular means, however, in the absence of statutory provision, shall be employed to protect the public when using streets or highways at railroad crossings is left to the company operating the road, the law merely demanding and requiring reasonable care in view of the circumstances." Pennsylvania Ry. Co.'s Appeal, 213 Pa. 373, 62 Atl. 986, 3 L. R. A. (N. S.) 140, 5 Ann. Cas. 299.

[5-7] As regards the duties and obligations of the traveler about to undertake to make the crossing, various and diverse conditions may arise in different cases. He may be afoot, on horseback, in a large, cumbersome vehicle, as, for example, a traction engine or a threshing machiné, a road wagon making much noise, a light buggy, making little, or in an automobile, noisy or not. He may be hard of hearing or not; his vision may or may not be defective. He may have one, or he may have several, tracks to cross; the approach to the crossing may be clear, the track straight, and his vision for many rods unobstructed; on the other hand it may be obstructed, either by natural objects, such as trees, curves, embankments, and buildings, or by cars temporarily placed on side tracks by the company itself. Again, his hearing may be interfered with by noises of machinery, waterfalls, other than those created by the company or by those of engines, machinery, etc., operated in the vicinity by the company itself.

In all this diversity of conditions there are, however, some legal principles generally applicable. He must never be unmindful that he is primarily responsible for his own safety; that the railroad, at a crossing, has the right of way; that at a railroad crossing "the track itself, as it seems necessary to iterate and reiterate, is itself a warning. It is a place of danger. It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom." Elliott v. Chicago, M. & St. P. Ry. Co., 150 U. S. 245, 248, 14 Sup. Ct. 85, 86 (37 L. Ed. 1068). The presence of noises or obstructions to view require a greater degree of caution to be exercised by him, and, if he fails to meet these requirements he is, under the law, as it now exists, held to be guilty of contributory negligence, which will bar any recovery for damages incurred, as against the railroad, whether the latter was negligent in the premises or not. Beyel v. Newport News & M. V. R. Co., 34 W. Va. 538, 12 S. E. 532; Berkeley v. C. & O. Ry. Co., 43 W. Va. 11, 16, 26 S. E. 349.

The only way the ordinary normal man can take these precautions is by control of his steps or the means he is using for locomotion, and the exercise of his senses of sight and hearing. Hence the rule to stop, look, and listen. In the state of Pennsylvania this rule is made absolute. He must stop, he must look, and he must listen. If he fails in any one, he cannot recover. Railroad Co. v. Beale, 73 Pa. 504, 13 Am. Rep. 753. This ruling, by the federal cases and those of this state, has been modified to a limited extent. This modification has been well stated by the Circuit Court of Appeals for the Eighth Circuit in Davis v. Chicago, R. I. & P. Ry. Co., 159 Fed. 10, 16, 88 C. C. A. 488, 494, 16 L. R. A. (N. S.) 424, in these words:

"The duty to stop is a relative one. It depends upon the situation of the particular case, the knowledge the traveler has of the situation, and the reliance he may reasonably place under the circumstances on his opportunities for seeing and hearing without taking the last precaution of stopping. The authorities are quite in accord on the proposition that if the view is unobstructed, so that an approaching train, before it reaches the crossing, can be seen, there is no occasion for the special exercise of the sense of hearing, listening; and therefore there is no reason why he should stop for that purpose. On the other hand, if the view is obstructed, interfering with the sense of sight, then he must bring into requisition the sense of listening carefully and attentively. And if there is any noise or confusion over which he has control, such as that of the noise of the horse's feet, or the grinding sound of the wheels, or the ordinary noise of the vehicle, interfering with the acuteness of the sense of hearing, it is his duty to stop such noise or interfering obstruction and listen for the train before going upon the track."

In support of this ruling, so clearly stated, and which so strongly appeals to reason and common sense, Judge Philips quotes strong excerpts from Judge Day's opinion in Shatto v. Erie Railroad Co., 121 Fed. 678, 682, 59 C. C. A. 1; from Chief Justice Doster in A., T. & S. F. Ry. Co. v. Willey, 60 Kan. 819, 825, 58 Pac. 472; from Mr. Chief Justice Alvey in Railroad Co. v. Hogeland, 66 Md. 149, 161, 7 Atl. 105, 59 Am. Rep. 159; from Chase v. Railroad, 167 Mass. 383, 45 N. E. 911; from Seefeld v. C., M. & St. P. R. Co., 70 Wis. 216, 222, 35 N. W. 278, 5 Am. St. Rep. 168; from Shufelt v. Flint & P. M. R. Co., 96 Mich. 327, 55 N. W. 1013; from Henze v. St. L., K. C. & N. Ry., 71 Mo. 640; from Stepp v. C., R. I. & P. Ry. Co., 85 Mo. 235; Merkle v. Railway Co., 49 N. J. Law, 473, 9 Atl. 680; and from Blackburn v. So. Pac. Ry. Co., 34 Or. 215, 55 Pac. 225-229.

This case has had large influence with me, for that it so well considers and reasons upon a state of facts very analogous to that I have here under review. It may be added that the Court of Appeals of Maryland, so recently as February last, in State, to use of Cullen, v. New York, P. & N. R. Co., 127 Md. 651, 96 Atl. 809, has again, in a strong opinion, affirmed the ruling that where the view is obstructed the traveler must stop, as well as look and listen. Other federal cases to this effect are N. Y. C. & H. R. R. Co. v. Maidment (C. C. A. 3d Ct.) 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794; Chicago, B. & Q. R. Co. v. Munger (C. C. A. 8th Ct.) 168 Fed. 690, 94 C. C. A. 176; Brommer v. Pennsylvania R. Co. (C. C. A. 3d Ct.) 179 Fed. 577, 103 C. C. A. 135, 29 L. R. A. (N. S.) 924; Shatto v. Erie R. Co. (C. C. A. 6th Ct.) 121 Fed. 678, 59 C. C. A. 1; C., M. & St. P. R. Co. v. Bennett (C. C. A. 8th Ct.) 181 Fed. 799, 104 C. C. A. 309; Northern Pacific R. Co. v. Alderson (C. C. A. 9th Ct.) 199 Fed. 735, 118 C. C. A. 173; N. Y. S. & W. R. Co. v. Thier (C. C. A. 2d Ct.) 209 Fed. 316, 126 C. C. A. 242; N. P. R. Co. v. Tripp (C. C. A. 8th Ct.) 220 Fed. 286, 136 C. C. A. 302; Delaware, L. & W. R. Co. v. Welshman (C. C. A. 3d Ct.) 229 Fed. 82, 143 C. C. A. 358. These authorities demonstrate that in the Second, Third, Eighth, and Ninth circuits the rule is established that, where the view is obstructed, it becomes the duty of the traveler in a conveyance liable to make noise calculated to interfere with effective hearing, it is his duty to stop, as well as to look and listen, and it is to be noted that these cases strongly emphasize, what common sense dictates should be so, that the stop must be made just before going on the

track, and not so far before such approach as to run any risk of its being ineffective. A careful examination has failed to disclose any different ruling in the other federal circuits.

But what is more important to this court than all other authority, because it is binding upon it, is the case of Neininger v. Cowan, 101 Fed. 787, 42 C. C. A. 20, in which the Circuit Court of Appeals for this Circuit has clearly established the same principle and affirmed a directed verdict for the railroad company, itself clearly negligent in the premises, because the traveler did not stop, look, and listen. At 101 Fed. 791, 42 C. C. A. 24, Judge Simonton says:

"In the case before us, the plaintiff was no stranger to the city of Wheeling. He was in the habit of going into it frequently, and was perfectly familiar with the place of the accident. He knew that the railroad track crossed at that place. He knew that the depot was a very short distance from it, and that trains left it for the East in the early morning. The track at the crossing itself gave warning of danger. The absence of gates and the nonappearance of a flagman at that point gave significance to this warning. Entering Main street in his wagon, he trotted his horses towards the railroad crossing until he reached a point 50 or 60 feet from it. Then he slowed down to a walk, but kept going on. *His plain duty, approaching that crossing, was to stop, look, and listen.* Had he, instead of going on the west side of the street, gone on the opposite side, he could have looked upon the track, up and down, before he reached the crossing. Instead of this, he selected the other side, from which his opportunity of seeing was prevented by the buildings at the corner of the crossing, and his ability of hearing distinctly was diminished by the same cause. Under these circumstances, unable to see, as well as to hear, *it was all the more incumbent upon him to stop.* This he did not do. Something must have prevented him from hearing the train. One of his witnesses, who was on that train, whose attention was not specially called to the fact, stated that as they were approaching the crossing the engine was giving that loud, puffing noise, indicating that it was going upgrade. Plaintiff did not hear this. Whether from inattention, or because of the noise of his moving wagon, does not appear. He did not hear. *All the more was it his duty to stop. Ordinary caution would have compelled him to stop.* Had he done so before crossing the track, the accident could not have happened. He went on, got on the track, and was injured. He himself contributed to the injury."

I have taken the liberty of italicizing four sentences in this extract from Judge Simonton's opinion in order to indicate how important and necessary this binding authority upon me has held it to be for the traveler *to stop* before crossing, where obstructions and noises exist.

In this case these facts are undisputed. Dernberger, the deceased, was a substantial, middle-aged farmer, eminently respected, sound physically, who had lived on and owned land in near proximity to the crossing, where the accident occurred, for many years. His use of the crossing was very frequent. At the time he was approaching the crossing, he was driving a two-horse team attached to a low-wheeled farm wagon, and two friends were riding therein with him. He came to within 200 feet of the crossing, where the view was wholly obstructed, when one of the traces became detached. He stopped, got out, and fastened this trace. He then got back into the wagon, drove to within 150 feet of the track, where he slowed down to a speed of two miles per hour, until his horses' feet were substantially upon the railroad track, when he discovered for the first time that the train was coming, uttering the words, "My God, there is the fast line!" His

horses lunged across the track. Anderson, one of the three men, jumped out of the rear end of the wagon. The engine struck the wagon and instantly killed Dernberger and the other man. Anderson testified that they were driving at a rapid rate until they reached 150 feet of the track, when they did not stop, but slowed down to a speed of 2 miles per hour. It was proved beyond all doubt that the view of the track was obstructed. Anderson stated that, at a point about 16 feet before reaching it, the track could be seen for a distance of 30 or 40 rods. He subsequently corrected this statement, and said for a distance of 30 or 40 yards. Young testified that from that point—16 feet before the team reached it—the track could be seen 360 feet. Recalling the fact that 5,280 feet constitute a mile, and 10,560 feet 2 miles, it is mathematically sure that Dernberger, driving at a speed of 2 miles per hour, would go 176 feet a minute, or $2^{14}/_{15}$ feet per second. He therefore drove this 16 feet from where he could see the track in a little over 5 seconds; had he stopped the noise of his wagon at that point for these few seconds, so as to be able to look and listen effectively, he would have saved his life. Nay more, admitting that the train was running 45 miles an hour, it was then covering 237,600 feet an hour, 3,960 feet a minute, or 66 feet a second. If Dernberger had stopped at the point 16 feet before reaching the crossing where he could see the track for a distance of 150 to 200 feet according to Anderson, 360 feet according to Young, for 2 seconds, the train would have beat him to the crossing. Such mathematical demonstrations must startle us into a realization of how necessary it was for Dernberger to have obeyed the legal obligation to stop, look, and listen.

I am constrained to reach the conclusion that in directing the verdict in this case I did not err, but was compelled to do so under the law. I must therefore overrule the motion for new trial, and direct final judgment to be entered for defendant.