(No. 18965.—

LAMINA CORY, Defendant in Error, *vs.* THE WOODMEN ACCIDENT COMPANY, Plaintiff in Error.

*Opinion filed December 20, 1928.*

WILLIAM and BARRY MUMFORD, for plaintiff in error.

CAPPS & WEAVER, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

Defendant in error, Lamina Cory, the widow of Martin C. Cory, obtained a judgment in the circuit court of Pike county for $1000 and costs of suit against plaintiff in

error, the Woodmen Accident Company, a corporation. An appeal was prosecuted to the Appellate Court for the Third District, where the judgment of the circuit court was affirmed. A writ of *certiorari* was granted by this court to the insurance company, and the cause is here for review.

The action in the circuit court was assumpsit upon an accident insurance policy issued by the company on June 3, 1912, to Martin C. Cory. The principal amount or maximum indemnity specified in the policy was $1000, payable, in case of the death of the insured, to his wife as beneficiary. The policy provides that the company or association agrees to pay the amount mentioned, "subject to the conditions provided herein and the articles of incorporation, by-laws and rules of this association now in force or which may hereafter be adopted, all of which, together with the application for membership, is made a part hereof and constitutes the contract of membership in case of loss of life, * * * when such loss * * * is caused directly and exclusively by bodily injury effected by external, violent and accidental means and which shall leave some visible mark, provided, however, that said injury shall cause death within ninety (90) days thereafter." The amended declaration, which had a copy of the insurance policy and the by-laws then in force of the company attached thereto and made a part thereof, averred that the insured died July 23, 1924, from a bodily injury received on June 15, 1924, by being shot by Victor Seybold, and that the death of the insured was caused directly and exclusively by such bodily injury so effected by external, violent and accidental means. There were five pleas filed to the declaration, four special pleas and one of the general issue, which latter plea was the only one surviving after demurrers to the special pleas were sustained. One of the by-laws of the company recited that "no indemnity shall be provided for either disappearance or injuries, disability or death sustained under any of the following conditions: * * * While the insured is engaged

in any of the following risks or acts: Dueling or fighting." It also recited that "no indemnity shall be provided to cover injuries, disability or death due wholly or in part, directly or indirectly, to any of the following causes: * * * Intentional acts of the insured or any other person." After the introduction of testimony the cause was submitted to a jury, which found the issues in favor of the beneficiary. The jury also made a special finding that the insured was not fighting when he received the gunshot wound. Judgment was rendered on the verdict, as has been previously stated.

The material facts developed upon the trial were substantially as follows: Martin Cory, the insured, with his wife, three children and a niece, Mina Huston, lived on a rented farm just west of Tempest, in Pike county. The house was on the south side of an east and west main traveled road and sat back some distance from the highway. The yard at the road was fenced, and a concrete walk extended from the road outside the front gate to the east side of the house. On the night of June 15, 1924, Cory, his wife and three children attended Children's Day exercises at Morrellville, Illinois, about three miles from their home. They returned home between ten and eleven o'clock P. M., where they saw Mina Huston and Herbert Johnson sitting in a car which was facing west on the south side of the road, near and just west of Cory's front gate. The Cory family all went into the house, and a short time thereafter a second car stopped, facing west alongside and north of the Johnson car, on the south part of the highway. This second car was a Ford roadster and was occupied by Victor Seybold and his friend, Leslie Potter. Seybold was a neighbor boy, who was then seventeen years of age and weighed about 135 pounds, and he had been keeping company frequently with Mina. Seybold asked Mina if there was anybody there that could prove what he (Seybold) had said about her. He had seen Cory that evening at the

Children's Day exercises. Mina then went to the north front door of the house and called to Cory, saying someone outside wanted to speak to him, and her uncle replied, "All right; I'll be there." No name was mentioned and no inquiry was made by Cory as to who wanted to see him. Mina returned to the road and was standing behind the Johnson car when Cory came out of the house and yard and stopped in the road. Seybold was then standing in the road back of his car and Potter was sitting in the Ford roadster. Where Johnson was does not appear, for he did not testify on the trial. Cory was a man perhaps forty years of age and weighed about 190 pounds. When he stopped in the road, back of the Johnson car, from five to eight feet from Seybold, he said, "Here we are; what will you have?" Seybold asked Cory what the latter had told Mina that he (Seybold) had said about her. Cory replied, "You have said a hell of a lot." Seybold denied having said anything. Cory replied, "You are a damned liar." Seybold said, "You are another one." There had been no change in position of the men till at this time, when Cory advanced quickly toward Seybold, who then told Cory to stand back or he (Seybold) would shoot him. Cory said, "No, you won't," and advancing upon Seybold, who was backing up, grabbed Seybold around the neck with his (Cory's) right arm. Just as Cory grabbed Seybold the latter pulled a gun out of his right trouser-pocket and shot to one side of Cory. Seybold had his head bent or pulled down, and after the shot was fired Cory tightened his hold on Seybold's neck as the latter was backing north across the road, and while Cory was putting his left hand to his hip pocket Seybold fired a second shot, striking Cory in the side and penetrating the liver. As a result of this wound Cory died on July 23. When the second shot was fired the two men were near the north side of the highway. The testimony of Seybold was that he backed across the road in an effort to get away from Cory; that he shot to make Cory let loose of

him; that he did not intend to hit Cory with the first shot fired but did intend to wound him with the second shot but did not intend to kill him.

It is contended by counsel for plaintiff in error that under the pleadings in the case it was error for the trial and Appellate Courts either to consider or permit instruction upon the question whether the insurance company had waived any condition precedent to a recovery under the contract; that the suit being upon an accident indemnity contract there can be no recovery, because the injury was not an accidental injury under the law; that the insured was engaged in fighting, which bars a recovery under the by-laws of the company; that the injury was the intentional act of another person and under the by-laws there was no liability on the part of the company; that a certain by-law of 1911 preventing benefits being paid for death resulting from unnecessary exposure to danger was still in effect and prevented a recovery under the indemnity contract; that certain peremptory instructions were refused, and the court erred in refusing, modifying and giving other instructions.

In the view we take of this case it will be unnecessary for us to consider all of the errors assigned and argued by counsel for the insurance company. We cannot agree with the trial and Appellate Courts in concluding, as a matter of law, that the injury here received was an accidental one, as that term is applied and understood under an accident indemnity policy of insurance. Counsel for defendant in error make the statement in their brief that Cory acted purely in self-defense and did not know Seybold was armed. The Appellate Court's view was that the evidence did not show that Cory at any time made any effort to strike or injure Seybold; that Cory's purpose, shown by his activities, was to disarm Seybold or keep him from using his gun; that Seybold had no intention of causing a mortal wound and Cory had no idea that Seybold would do so; that the death of Cory was unforeseen, unexpected and not the necessary

result of the shooting, and therefore should be considered as accidental. It seems unnecessary for us to set out in detail the testimony of the three eye-witnesses to the unfortunate happening. We have carefully read the evidence in the record, and our conclusion of what actually occurred is disclosed by our statement of the facts. There was no contradiction by defendant in error of any statement made by any of these eye-witnesses, and a careful analysis of their reports of what happened must be taken as true and correct.

The term "accident," as used in accident insurance policies, has frequently been discussed by the courts. In *Hutton* v. *States Accident Ins. Co.* 267 Ill. 267, this court said that an effect which is the natural and probable consequence of an act or course of action cannot be said to be produced by accidental means. The facts, in brief, in that case were, that two powerful men engaged in a fist fight, which was voluntarily commenced by the one who was the holder of the insurance policy there involved. The insured had his leg broken in the combat and brought suit on his accident policy. The court said: "Where one voluntarily and deliberately engages in a fight or brawl and places another in a position where he, too, must fight to defend himself, it is a natural result, and one known to all sensible men as likely to follow, that one or both of the combatants will receive more or less serious injury. As to whether the assailant or the one assailed would be the more likely to be injured would depend upon the comparative strength and skill of the antagonists as well as upon the fortunes of the combat." It was also said that the insured in the case "was bound to know that one of the natural and probable consequences of voluntarily engaging in an assault under such circumstances was that he might be injured, although he could not, of course, foresee the exact form of the injury he might receive, or, indeed, be able to know certainly that he would be injured at all. Such being true and the assault commit-

ted upon Huddlestun being the deliberate and voluntary act of appellee, the injury which he received as a result cannot be said to have been caused by accidental means." The court also recited a further rule from the case of *Prudential Casualty Co.* v. *Curry,* 65 So. 852: "An accident may be said to be an unforeseen or unexpected event of which the insured's own misconduct is not the natural and proximate cause, and hence a result ordinarily and naturally flowing from the conduct of the insured cannot be said to be accidental even when he may not have foreseen the consequence, and the happening of an event, to be termed an accident, must not only be unforeseen but without the design and aid of the insured." The doctrine announced in the *Hutton case* was again quoted with approval by this court in *Christ* v. *Pacific Mutual Life Ins. Co.* 312 Ill. 525.

The undisputed evidence in this case shows Cory was the first to pass the lie, and when it was returned to him, Cory, who was much larger and more powerful than Seybold, who was seventeen years old, quickly advanced upon Seybold, and the latter told him to stand back or he would shoot him. Cory continued his advance and grabbed Seybold by the neck, and at this moment Seybold, retreating, pulled his gun from his right trouser-pocket and fired a shot to one side of Cory. The latter continued to advance, tightened his grip around Seybold's neck, reached toward his own hip pocket with his left hand, and Seybold intentionally fired a second shot, causing the fatal injury to Cory.

The facts as presented by this record are unlike those found in the cases of *Lovelace* v. *Travelers' Protective Ass'n,* 126 Mo. 104, and *Union Casualty Co.* v. *Harroll,* 98 Tenn. 591, relied upon by defendant in error. In each of those cases the insured was not aware or did not have reason to believe that his adversary was armed with a deadly weapon which was used and caused the death of the insured. In the case before us, what was the purpose of the advance made by Cory upon Seybold? Was it not

an outward demonstration or possibly a challenge to Seybold on this light night after the original passing of the lie by Cory and it having been returned by Seybold, that a trial of the issue was to be had by the personal prowess of the disputants? Cory's advance certainly did not import a proposal or invitation to further discuss the matter. It was at this point of advance that Seybold first warned Cory to stand back or he would shoot him, and again Seybold warned him when he fired the first shot. Had Cory objected to an assault or combat or pursued a pacific policy there is no reason to believe he would have been unsuccessful. Had he not been the aggressor and had he done nothing to provoke the encounter there is no probability that he would have been fatally shot. We have no way of knowing from this record what Cory thought or saw, either immediately preceding or during the encounter. However, in our opinion, with the warning which Cory had, any man with ordinary intelligence and prudence would have had reason to believe that Seybold was armed, and could have reasonably foreseen and expected that if Cory's voluntary and unnecessary advance was continued upon the boy that serious injury from his use of such deadly weapon would in all probability result. The shooting of Cory under the conditions and circumstances cannot be said to have been an accident, and therefore the results flowing therefrom cannot be held to be due to an accidental cause. Hence there could be no recovery under Cory's accident indemnity contract.

We think the trial court erred in refusing peremptory instruction "B," authorizing the jury to find for the insurance company, and that the Appellate Court was in error in affirming the judgment of the circuit court.

The judgments of the Appellate and circuit courts are therefore reversed. *Judgment reversed.*