WORLEY et al. v. INTERNATIONAL TRAVELERS ASSUR. CO.

No. 13622.

Court of Civil Appeals of Texas. Fort Worth.

Nov. 12, 1937.

Rehearing Denied Dec. 10, 1937.

Louis Wilson and R. M. Vaughan, both of Dallas, for appellants.

Malone, Lipscomb, White & Seay, of Dallas, for appellee.

SPEER, Justice.

For the purpose of discussing this appeal it is sufficient to say that Geraldine Worley and Valderia D. Pugsley, as the only children or descendants of Val Waggle, prosecuted this suit against the International Travelers Assurance Company for recovery on a policy of accident insurance carried by Val Waggle in his lifetime. Upon a jury trial the court instructed a verdict for the defendant and the plaintiffs have appealed to the Dallas Court of Civil Appeals, and by the Supreme Court the cause was transferred to this court for determination.

Appellants alleged the issuance by appellee on November 2, 1921, of a policy of indemnity insurance to their father, against the loss of his life resulting from personal bodily injury, effected directly, independently, and exclusively of all other causes through accidental means; that while the policy was in force and effect Val Waggle did on the 14th day of June, 1931, and on September 1, 1931, receive bodily injuries, effected directly, independently, and exclusively of all other causes through accidental means, which resulted in his death within 90 days thereafter.

The two accidents from which it is claimed death resulted consisted of (1) falling down a flight of steps into a basement in the home of Mrs. L. L. Cook, in Battle Creek, Mich., on June 14, 1931, at which time he struck a concrete floor in said basement, with his head and other parts of his body, describing the nature of his wounds, and (2) that on September 1, 1931, while being treated in a hospital for the injuries received on June 14, 1931, the said Val Waggle was walking down a hallway in the hospital; that he was approached by two attendants of the institution who protested his leaving the hospital, and forcibly returned him to his room and bed; in doing so the attendants entered into a violent scuffle with Val Waggle in which his clothing was torn from his body and that as a result thereof he was bruised and lacerated about his head, body, and limbs; that the nerves and tissues of each of said members were injured, and that his whole physical system was thereby reduced to a weakened and exhausted condition; that as a direct and proximate result of said accidents and acts of physical violence the insured died on September 9, 1931.

Appellee defended under allegations of a general denial and special pleas of the conditions contained in the contract, claimed to exempt it from liability, one of which was alleged to be a provision in the policy which reads as follows: "International Travelers Association hereby insures Val Waggle * * * against loss resulting from bodily injuries, effected directly, independently and exclusively of all other causes through accidental means * * * subject to the terms, provisions and limitations in this policy."

In this connection allegation was made specially denying that death ensued from injuries effected directly, independently, and exclusively of all other causes, through accidental means. But that for a long time prior to, and at the time of his death, Val Waggle was afflicted with atrophic cirrhosis of the liver, alcoholism, syphilis, and chronic mental disease; and that his death was contributed to and caused by each and all of said diseases.

The disposition of this appeal must be determined upon the question of whether or not the peremptory instruction given by the court was proper. Appellants have assigned it as error, and naturally appellee contends it was warranted, under the pleadings and testimony.

We do not believe there was any testimony of probative force offered by appellants 'which would have supported a judgment for appellants if the question had been submitted to the jury and a verdict had been returned by it favorable to them. Under such circumstances it was the duty of the trial court to give the peremptory instruction. It is not the prerogative of a trial court nor of this court to pass upon the weight of the testimony nor to determine if the preponderance is in favor of parties plaintiff; but the only question for the court's determination is whether or not there is any testimony of probative effect to support an alleged cause of action or a defense.

The Supreme Court lays down the test by which we are to be guided in the case of Wininger v. Fort Worth & D. C. Ry. Co., 105 Tex. 56, 143 S.W. 1150, in this language: "If, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff."

In discussing the duty of the trial court to take the case from the jury by an

instructed verdict, the court said in that case: "in other words, to authorize the court to take the case from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it." The principles above announced have uniformly been followed by our courts, and constitute the law governing such matters.

Appellants recognized, at the time of the institution of this suit, that to recover they must show that the insured met his death solely from bodily injuries, effected directly, independently, and exclusively of all other causes through accidental means. They alleged this as a basis for recovery. The contract of indemnity provided that appellee would pay the amount named if the insured met his death as a result of bodily injuries "effected directly, independently and exclusively of all other causes through accidental means." Unless it can be said that Val Waggle's death was the result of injuries sustained independently of any other contributing cause, the appellants could not recover. In other words, if his previous physical condition, brought on by disease from which he had suffered and which lasted up until the time of his death, contributed to his death, and but for which his death would not have resulted from the injuries, no liability was shown. The burden of proof was on the appellants to show their father died solely from the results of the injuries alleged, and this burden was not discharged by showing he received an injury and that he thereafter died within the period of time in which liability would attach.

In Maryland Casualty Co. v. Glass, 29 Tex.Civ.App. 159, 67 S.W. 1062, 1063, the court had under consideration the question here involved; there the policy provided the company would pay the amount contracted for if death resulted within 90 days from injuries sustained by accidental means "independent of all other causes." The provisions of the policy included liability for death resulting from anaesthetics administered by a regular physician. The insured was stricken with appendicitis and an operation was necessary; the anaesthetic was administered by a regular practicing physician and during the operation the insured died; the court said: "The burden of establishing the fact that the death of M. E. Glass resulted, independent of all other causes, from chloroform administered to him, is on the plaintiff. In other words, she must prove that the

anaesthetic was proximately the sole cause of his death. If his death was caused by it alone, the appellant, by the policy, is liable to the appellee in the principal sum therein specified. But if he was afflicted with disease which caused or directly contributed to his death, the company would not be liable, though chloroform might have been a cause concurring with his affliction in producing death. If he was suffering from appendicitis, as is shown by the indisputable evidence, and if the anaesthetic would not have caused his death had it not been for such affliction, but he died because the chloroform aggravated the effects of the disease, or appendicitis aggravated the effect of the drug, the company would not be liable under its contract. For in either event appendicitis and chloroform would be concurring and inseparable agents proximately contributing to his death, and it could not have been the result of an injury from anaesthetic, independent of all other causes. Commercial Travelers' Mut. Accident Association v. Fulton, 79 F. 423, 24 C.C.A. 654; National Masonic Acc. Association v. Shryock, 73 F. 774, 775, 20 C.C. A. 3; Westmoreland v. Preferred Accident Insurance Co. (C.C.) 75 F. 244, 245; Hubbard v. Mut. Accident Association (C.C.) 98 F. 930; Travelers' Insurance Co. of Hartford v. Melick, 65 F. 178, 12 C.C.A. 544, 27 L.R.A. 629; Travelers' Insurance Co. v. Selden, 78 F. 285, 24 C.C.A. 92; Travelers' Insurance Co. v. McConkey, 127 U.S. 661, 8 S.Ct. 1360, 32 L.Ed. 308."

In other cases by the courts of this state, in discussing issues for determination, similar language to that in Glass Case, supra, has been used. In American National Ins. Co. v. Briggs (Tex.Civ.App.) 70 S.W.2d 491, 494, in which a writ was dismissed, where compensation for disability was claimed on account of an accidental injury, the court said: "If his disability was partly due to syphilis, then he could not recover under the conditions of the policy."

In Robinson v. Aetna Life Insurance Co. (Tex.Com.App.) 276 S.W. 900, 902, the suit was predicated upon a policy of insurance indemnifying against death as a result of accident. The insured died from apoplexy, claimed to be the result of an external injury. The company pleaded a general denial which entitled it to show the converse of plaintiff's contention, if it existed, and, in holding defendant should have had that issue submitted under the testimony, the court said: "But, if the deceased died from

apoplexy as that term is commonly understood—that is, from a rupture or break of a blood vessel into the brain not caused in any respect by any external, violent or accidental means—then clearly such death is not covered by the policy under consideration. This issue should have been submitted." As stated, the Briggs and Robinson Cases were decided upon questions of issues to be submitted under the facts therein shown and are cited by us here to show that our courts have continued to recognize the principles announced in the Glass Case, supra.

■ The burden was on appellants to prove that death resulted from the injuries alleged to have been sustained by the deceased; this of course depended largely upon the judgment of experts competent to testify in such matters. The question would have been raised had it been shown that the accidental injuries were received and that exclusively and independently of all other causes death would have, with reasonable probability, resulted therefrom. It was not proven nor was the issue raised by showing that death could result from a fall such as that received by the insured, nor that it was possible for such a fall to produce death. "Neither expert witnesses nor the jurors may be turned loose in the domain of conjecture as to what may by possibility ensue from a given statement of facts. The witness must be confined to those which are reasonably probable, and the verdict must be based upon evidence that shows with reasonable probability that the injury will produce a given effect." Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491, 493; Green v. Ry. Co., 125 Tex. 168, 81 S.W.2d 669; Houston & T. C. Ry. Co. v. Swancey (Tex.Civ.App.) 128 S.W. 677, writ dismissed.

■ The testimony upon which appellants rely to show Val Waggle died from accidental injuries received independently and exclusively of all other causes, and considered most favorably to their contention, consisted of the following:

The appellants, who were daughters of the insured, testified they were about 19 and 21 years of age at the time of the trial in 1936; that prior to 1931, when their father left the last time, they were living with their mother in Dallas, but were with their father several times each week and especially on week ends over a period of several years before he went away; they could see no difference in his physical condition over that period of time except that for some months before going north they noticed that their father's stomach was out. They said their father was a tile contractor and worked at his office on blueprints and details at all times during work hours; that he drove his car everywhere he wanted to go; that he took them on trips to Houston and other places (the time of these trips is not shown); that he was good to them and bought them such things as he learned they wanted; that some months prior to the time he left Dallas, they knew Dr. Giles tapped his stomach and took some fluid from it; at no time prior to his going away did they notice anything apparently wrong with his mind; neither of them ever saw him drink hard liquor, nor did they ever see him when he was under its influence; they knew their father had been under the care of both Drs. Giles and White for quite a while before leaving; they knew their father was in the hospital and visited him there, perhaps a year before he left; they knew the doctors were tapping their father's stomach but didn't know how often; they were not sure about dates but they knew their father was picked up on the roadside in an unconscious condition near Henderson, Tex., and was carried to the hospital where he remained there about ten days; he was brought back to Dallas and placed in the hospital; that on this occasion he had started north but because of his condition when found at Henderson, Tex., he was brought back to Dallas; he had been out of St. Paul's Hospital a very short time before he started north again on his last trip; they understood their father was going north to visit his people; they knew he was going to see them and visit the races in Kentucky and that he was going to Battle Creek, Mich.; he was not satisfied with the doctors in Dallas; when he left the last time he packed his own car with his belongings and put a cot in it; they received a letter from him while he was in the north; he wanted to go to Battle Creek, Mich., to see if he could get something done for his stomach.

Ed Belew testified he was an employee of deceased for about 3 years before Waggle went on his last trip to the north; that deceased worked regularly all the time, estimating contracts for tile jobs, visiting jobs, and supervising the work; drove his car wherever he wanted to go; many of the jobs were for large sums of money;

this involved very careful estimates and contracts to avoid losses; it required a man of keen mind and one who understood his business; the witness had seen deceased take a few ·drinks of liquor but not within the last few months he was in Dallas; insured was a headstrong man; powerful will power; for sometime before he left he planned to go to his old home and to Battle Creek, Mich. He said: "I was surprised to know that his mind and will power was apparently as strong just before he left as it had been during the time I had known him; I knew he was under the care of a physician for quite a while; I knew of his distended stomach; I had observed this and observed it many times; I knew that for a period of several months before he left he was having his stomach tapped every five or six days; I knew that he had started north a short time before the last time he started and was brought back from Henderson, Texas"; a short time before he started on his trips north witness noticed a material change in his physical appearance; he was a changed man; when his stomach was tapped he had a different appearance in his face; it looked like a considerable change to witness from what he had known of him; he appeared much weaker, but would do things that would fool him; it appeared that he was going on sheer will power.

Mrs. E. N. Baker, the mother-in-law of deceased, testified to many of the same things related by appellants, and said she saw deceased frequently before he went away and that to her he appeared to be in as good physical condition as he had been in the past.

Mrs. Edith Cook testified by deposition: That she lived in Battle Creek, Mich., and ran a rooming house there; that deceased took a room at her house in June, 1931; the room was on the second floor; that her home was a two-story house with a basement under it; the door to the basement opened in the kitchen; when deceased came to her home he attended to his business; he was apparently in very good physical condition when he came there; he drove his car about when he wanted to go places; he drove to the sanitarium to see his doctor; he went out one afternoon and did not return at night; when he returned the next day he said he had turned over in a ditch and stayed there all night until a farmer pulled him out next morning; he was rather stupid acting that morning; he said he was taking treatments at the sanitarium for illness. She said: "On June 14, 1931, I left my home after the lunch hour and did not return until about 5 P. M.; when I returned Mr. Waggle was in his room bathing his leg; we noticed a· scratch or bruise on his head, which was about as big as a dollar; it appeared to be a deep bruise and was scuffed; there was no blood on his face but there was blood on his pants' leg; we put mercurochrome on his head and leg; he said he had slipped on a bag of potatoes at the top of the basement steps and fell down the steps with the potatoes; I had noticed the cellar door open and that was the occasion for me to inquire of him as to what had happened; the potatoes were scattered on the steps and on the cellar floor; I found his glasses and some change on the cellar floor; there are fourteen steps in the stairway of the basement and the floor is concrete with a rug on it; when I saw Mr. Waggle he was weak and complaining with his knee and head; he said his head hurt him; he did not have a doctor that day. but the next day he was in bed most of the time and Dr. Martensen saw him; he was unconscious a part of the day after he was hurt; I do not know how the doctor treated him; he was taken to the hospital the third day after he fell; after the fall there appeared to be a change in his mind; he could not dictate his letters; after a short stay at the hospital he returned to my house; he was weak and was complaining of his head; he was later taken to the Kalamazoo State Hospital and I saw him there several times; I saw him on the 6th of September; he did not know I was coming and was glad to see me; he thought he was going home with me; I helped him put on his clothes and as he and I walked down one of the hallways we met two attendants and they seized him and declared he must return to his ·room; a violent struggle ensued in which his clothes were torn partly from his body and they forced him back to his room, and in the struggle they threw him or he ·fell on the floor; they finally got him in his bed and he was thoroughly exhausted; his body was bruised badly; he never did rally from that encounter but died on September 9th following."

Dr. Giles, physician in Dallas, testified that he had known deceased since about 1925 and saw him professionally frequently during 1930 and up to the time he went away (May, 1931); deceased was afflicted with cirrhosis of the liver which caused the

patient to have an excess accumulation of fluid form in the abdominal cavity; that this fluid was extracted from him many times; this is not a major operation. "We administer a local anaesthetic, insert a needle and the fluid is drawn through a tube; it doesn't require but a short time, from fifteen to thirty minutes; in my diagnosis and treatment of his case I found he had cirrhosis of the liver and that his blood was infected with syphilis, this is called vascular syphilis; in the early part of 1930 his condition was fairly good and we were tapping him for cirrhosis but by the end of the year and the beginning of 1931 we were having to tap him more frequently and his progress was downward; during that time he had one or two spells of hemorrhage from his stomach." By a hypothetical question to this physician, based on matters above shown to have been disclosed by the testimony, he was asked what in his judgment would have been the normal life of Waggle under the treatment that was being given him, and the witness answered that he could not tell with any degree of certainty how long such a patient would live. Being pressed for an answer based on his judgment of the condition of deceased and the matters embraced in the question, the doctor said: "couldn't say, a year or two, it would be only relative." He further testified that the spinal fluid was negative as to the syphilitic condition affecting the brain; knowing the man as the witness did, he knew deceased did not have much reserve strength. He said the activities of the patient, as revealed by the question, might indicate he had considerable strength if he had not known the patient; even though he could drive his car on this long trip he knew he did not have much strength and endurance; his resistance was very poor; on his reserve strength he may have the ability to go on; sometimes the disease he had would not knock him over for maybe a month or two and he would carry on until he broke down again; he was progressively growing worse when he saw him last; his disease was incurable and it would eventually result in death; from the fact that he was being tapped approximately every 6 days over a period of months indicated that he had reached an advanced stage; that he saw him unconscious twice during the year or year and a half he treated him.

Dr. Stone, of Dallas, testified that he was a physician, and being propounded a similar hypothetical question involving the history of deceased's afflictions and his activities, was asked how long, in his judgment, the deceased would naturally have lived; he said to answer would be prophesy; he related another case under his treatment that had lived 15 years.

Dr. Brewer, a physician in Dallas, testified in answer to the following hypothetical question, which embraced the fall detailed by Mrs. Cook: "What would be the probable effect upon the patient of a fall of that nature?" that he could have had many things happen under such conditions; he could have had a concussion of the brain; he could have had a fractured skull; there could have been a hemorrhage from a ruptured membrane covering the brain. Being asked if such a fall could or would produce death, the witness said: "All I can say is that if it did in this case it would, and if it didn't in this case it wouldn't." Referring to the struggle at the hospital described by counsel, witness said: "If there were injuries present at the time of the struggle you allude to, that would aggravate things from an old existing condition where a new condition is superimposed. Any exhaustive struggle of that nature would be hard on him, of course. Any struggle on any man who is sick or injured in any way is hard on him; it is dangerous; such a struggle coupled with a prior injury could probably produce death."

The depositions of three physicians who attended the insured while in the hospitals in Michigan were taken, but they were not asked for an opinion as to the nature and extent of the insured's injuries nor as to what caused his death.

The testimony offered clearly shows that Val Waggle's death was caused by the combination of his weakened physical condition from diseases from which he had long suffered, and the injuries sustained on the two occasions mentioned in appellants' pleadings. Under the authorities from which we have quoted, if his previous physical condition proximately contributed to his death, then the accidental injuries sustained were not the sole cause of his death. In these circumstances, the burden of proof was not discharged by appellants, which required them to show that their father died as a result of accidental injuries received, exclusive and independent of all other causes. Having failed to offer testimony of probative force to sustain this burden, and to exclude the inevitable conclusion that there

were other contributing and concurring causes, it was proper for the court to give the peremptory instruction.

Appellee contends that the trial court erroneously admitted the testimony of the witness Edith Cook, wherein she testified as to what deceased told her about his fall down the basement steps, and that without it there was no testimony before the court of an injury on June 14, 1931; further insisting that a judgment would not be permitted to stand, based upon improper testimony. We cannot agree with the contention that this testimony was not admissible.

We are not unmindful of the rules governing hearsay testimony, self-serving declarations, or of the principle involved in declarations which form a part of the res gestae in such cases. We are cited by appellee to the case of Great Atlantic & Pacific Tea Co. v. Walker (Tex.Civ.App.) 104 S.W.2d 627, in which a very definite pronouncement is made condemning the admissibility of the testimony. But we find the Supreme Court has granted a writ of error in that case based upon a conflict between what is there announced and many other cases cited when the writ was granted.

■ There is no question but there are ample precedents for the exclusion from evidence of declarations and statements made by an injured person after his injuries are sustained. These cases are based upon the wholesome doctrine that such statements must be a part of the transaction; so nearly coincident with it that the taint of fraud and fabrication will be excluded. Metropolitan Casualty Ins. Co. v. Woody (Tex.Civ.App.) 80 S.W.2d 771; Dallas Hotel Co. v. Fox (Tex.Civ.App.) 196 S.W. 647, affirmed by Supreme Court, 111 Tex. 461, 240 S.W. 517; many more similar cases could be cited.

■ The rule of law in this state seems to be that a certain amount of liberality must be indulged by the court trying the case in determining whether or not a piece of proposed testimony tends to detail the occurrence sought to be proved and is free of a self-serving purpose. In the Dallas Hotel Company Case, supra, the court quoted from the case of Pilkinton v. Ry. Co., 70 Tex. 226, 7 S.W. 805, 808, wherein the Supreme Court said: "To be a part of the res gestae the declarations are not required to be precisely concurrent in point of time with the principal transaction, if they spring out of it, are voluntary and spon-

taneous, and are made at a time so near as to preclude the idea of deliberate design. * * * The rule is very latitudinous, and its application must be left largely to the judicial discretion of the trial court." The same rule is again announced in Southern Surety Co. v. Weaver (Tex.Civ.App.) 260 S.W. 622, affirmed by the Supreme Court, 273 S.W. 838.

In International Travelers' Association v. Griffing, 264 S.W. 263, 265, writ dismissed, Justice Looney, speaking for the Dallas Court of Civil Appeals, briefly announced the rule in this language: "There is no hard and fast rule as to the precise time near an occurrence within which declarations explanatory thereof must be made in order to be admissible. * * * Whether or not [it is] res gestæ rests largely in the discretion of the trial court."

■ In the case before us, it is not shown exactly when Waggle fell, but the witness had left home after lunch hour and returned at 5 p. m. and during the elapsed time he is supposed to have fallen down the basement steps; it may have been nearly 5 hours or it may have been a very few minutes, yet while he was still bathing his wounds and had not removed his bloody clothing he made the statement complained of to the first person shown to have spoken to him after he fell; this with the attending circumstances surrounding his statement that he did fall, such as the potatoes being scattered on the basement floor, his glasses and change being found by the witness at the place where he claimed to have fallen, were sufficient to warrant the trial court, in the exercise of his judicial discretion, to admit the testimony. It was such testimony as appellants could rely upon in establishing their case, and we have so considered it, and yet believe they failed to establish their right to recover on the contract of insurance.

By stipulation in the record, it appeared that the policy of insurance sued on was issued by International Travelers Association, but that prior to the death of the insured appellee International Travelers Assurance Company took over and guaranteed the contract.

For the reasons shown, all assignments of error challenging the action of the court in instructing a verdict for appellee are overruled.

■ There are other assignments complaining of the rulings of the court in sustaining objections to parts of the testimony

produced by depositions, but the admission of the excluded testimony would not have changed the rule herein announced and it becomes unnecessary to discuss them.

Finding no error in the record, it becomes our duty to affirm the judgment of the trial court, which is accordingly done.

Affirmed.