## TEXAS PRUDENTIAL INS. CO. v. TURNER et al.

### No. 3444.

Court of Civil Appeals of Texas. Beaumont.
April 19, 1939.

Rehearing Denied April 26, 1939.

Orgain, Carroll & Bell, of Beaumont, for appellant.

C. E. Pool, John H. Benckenstein, and Jack M. Moore, all of Beaumont, for appellees.

WALKER, Chief Justice.

This suit was filed in the County Court of Jefferson County, Texas, at Law, Jefferson County, by Lillian Turner, one of the appellees, widow of Calvin G. (Doc) Turner, against appellant, Texas Prudential Insurance Company, to recover double indemnity under a policy of life insurance issued by appellant on the 17th day of August, 1936, to Doc Turner, and which was in full force and effect at the time of

his death. Roberts Undertaking Company intervened, claiming an interest in the policy. By its answer appellant admitted liability for the face of the policy, denied liability for double indemnity, and tendered an interpleader, which was refused by the court.

On the verdict of a jury, judgment was entered in appellee's favor for the relief prayed for—principal face of the policy, double indemnity, attorney's fees, damages, etc. Judgment was also in favor of intervenor. On the undisputed evidence, it is our conclusion that the lower court should have instructed the jury to return a verdict in favor of appellant, and that the judgment in favor of appellee should be reversed and judgment here rendered for appellant.

The face of the policy was $360; before the suit was filed appellant duly tendered payment of the full face of the policy, less one weekly payment of twenty cents, which was refused.

Double indemnity was claimed under the following policy conditions: "Double Death Benefits for an Accidental Death.— Upon receipt of due proof that the Insured after attainment of age 5 and prior to the attainment to age 70, has sustained bodily injury, solely through external, violent and accidental means, occurring after delivery of this Policy and resulting in the death of the insured within ninety days from the date of such bodily injury while this Policy is in force, and while there is no default in the payment of premiums, the Company will pay in addition to any other sums due under the policy, and subject to the provisions of this Policy, an Accidental Death Benefit equal to the face amount of insurance stated in this Policy, less the amount of any disability benefit which has become payable under this Policy on account of the same bodily injury."

The facts on this issue are without dispute. Jack Garrett, appellee's principal witness, testified that on the 30th day of October, 1937, he was working for Mr. Burge on his parking lot in Beaumont. About 2 P.M. he and a friend, Garland Tilley, went from the parking lot to the Baylis Cafe to drink a bottle of beer. As he was leaving the cafe he was assaulted by Doc Turner, a stranger, without provocation on his part:

"Q. What was the reason for the argument or the fight? A. Well, I really don't know of very much reason for it except he just jumped on me. I didn't know the man, never saw him before in my life, he followed me down the street and wanted to fight about something.

"Q. Just wanted to fight? A. Yes, sir.
* * *

"Q. Well, was it much of a fight or just a little scrap? A. Just a little scrap, didn't amount to much."

After the fight, Garrett went back to the cafe where he remained four or five minutes; while there he 'phoned the police about his trouble with Turner, and then returned to his job on the parking lot. After twenty or thirty minutes he went back to the cafe, and while there on that visit was assaulted by J. B. Baker—under one theory of the evidence Garrett was the aggressor, but under Garrett's testimony Baker was the aggressor. After that fight Garrett returned a second time to his job on the parking lot. Again, after about fifteen minutes, he left the parking lot to return to the cafe. We give his testimony, Q. and A. reduced to narrative: "I went back to the cafe to pay the bill, and took a loaded gun with me, a little twenty-two pistol— revolver type. I did not go into the restaurant. Well, before I got there I noticed a car parked there in front, a Ford a '33 or '34 model, and when I got within fifteen or twenty feet of the cafe entrance, I glanced up and saw the Ford and the fellow I had the first trouble with, later I found out he was Mr. Turner. He was in the front on the right hand side of the car with two or three others; I am sure there was more than three. As I walked up they got out of the car. Mr. Turner got out of the car, he was first out, he was sitting on the right hand side, in the front, it was a two door, he got out and started towards me. They all got out; I guess Turner was about half-way to me before they all piled out. Turner was running towards me; I didn't notice whether the others were running or not; all of them came at me. Mr. Turner said something about, I heard him say: 'Well, I am going to fix you this time, you came back for some more and I am going to fix you this time,'—and mumbling. If the others made any statement, I didn't hear them. I told Turner to halt, pulled out the gun and told him to stop or I would shoot; he didn't stop, they all kept coming. I shot. The first time I pulled the trigger, the gun snapped and I pulled it again. It might have snapped the first two times. I am

pretty sure it snapped twice, might have been once between shots or might have been at that time, I know the first time it snapped. I was rather excited; I shot three or four times. I didn't think I had hit anybody; I didn't stop to think whether I had hit anyone; they didn't fall. After shooting, someone—they took the gun away from me; I am pretty sure it was Mr. Turner, just by the position he ran into the cafe. After I had shot, all four of them ran into the cafe. I had just a side glance of the person that took the gun. I walked to the cafe door to open it, it is painted on one side of the glass, you can see up to the ceiling half of the building. Well, I opened the door and had the gun in my hand, started in the cafe. They ran to the back. I noticed two or three running back, and when I got there someone kind of went like they would follow and reached out and grabbed the gun. I closed the door, and started on back across the street. Whoever got the gun, shot at me twice; I don't know who it was; they didn't hit me. I then went over to the parking lot, and was arrested."

Though he didn't know it at the time, Garrett shot Turner, mortally wounding him. He was indicted and tried for the murder, and was acquitted on the plea of self-defense. Jack Garrett was offered as a witness by appellee, and the testimony, as summarized above, was given on his direct examination.

Dr. H. J. Mixson examined and treated Turner for his wound. He testified, Q. and A. reduced to narrative: "I found a penetrating wound passing entirely through the right side of the body. The bullet had penetrated entirely through the body. I would assume, from the nature of the wound, that Turner was shot from the back; I mean the bullet penetrated from the back and out the front."

J. B. Baker, called by appellant, testified, Q. and A. reduced to narrative: "I saw the first fight between Garrett and Turner; I knew Doc Turner only when I saw him; after that fight, Garrett returned to the cafe and used the telephone. He had a fight with Garrett on his second visit to the cafe. I saw Garrett shoot Turner, and Garrett also shot me in the leg. Garrett is now under indictment for shooting me. After his fight with Garrett, Turner left; a boy was with him. Doc Turner dropped back to the cafe; he had gotten back. I saw a car drive up; at the time I didn't know who was in the car—Doc Turner was one of the parties in the car. When it first drove up, right at that time, no one got out. I walked out and saw this fellow holding a gun on Doc. No one else was out of the car that I know of. Garrett was pointing the gun at Doc; Doc was just standing there. When the boy standing, pulled the trigger, and the gun snapped, Turner went to walk towards him. He had not been in that car with Turner. He just stepped out of the cafe, and was in back of Turner. When the shooting started, I turned to get back into the cafe as fast as I could. When I first saw Garrett that gun was pointing towards Turner and not at me. Before the shooting I heard something but I couldn't understand what it was."

## Opinion.

■■■■ Appellant was obligated to pay "double indemnity" only on condition that Doc Turner's death resulted from a bodily injury sustained "solely through external, violent and accidental means." In Bryant v. Continental Casualty Company, 107 Tex. 582, 182 S.W. 673, 678, L.R.A.1916E, 945, Ann.Cas.1918A, 517, our Supreme Court gave the following definition of the term "accidentally caused": "The proper and true test, in all instances of voluntary action, is that defined in the Barry Case: If in the act which precedes the injury, though an intentional act, something unforeseen, unexpected, and unusual occurs, which produces the injury, it is accidentally caused. If the injury followed in a usual or reasonably to be expected way from the means voluntarily employed, that is, the given voluntary act, it is not a result accidentally effected."

We quote from Cory v. Woodmen Accident Co., 333 Ill. 175, 164 N.E. 159, 162, by the Supreme Court of Illinois: "Had he not been the aggressor and had he done nothing to provoke the encounter, there is no probability that he would have been fatally shot. We have no way of knowing from this record what Cory thought or saw, either immediately preceding or during the encounter. However, in our opinion, with the warning which Cory had, any man with ordinary intelligence and prudence would have had reason to believe that Seybold was armed, and could have reasonably foreseen and expected that if Cory's voluntary and unnecessary advance was continued upon the boy that serious injury from his use of such deadly weapon

would in all probability result. The shooting of Cory under the conditions and circumstances cannot be said to have been an accident, and therefore the results flowing therefrom cannot be held to be due to an accidental cause. Hence there could be no recovery under Cory's accident indemnity contract."

In McCrary v. New York Life Insurance Co., 8 Cir., 84 F.2d 790, 792, the court said: "To render the defendant liable for double indemnity, the cause of the injury must have been accidental. The result of what is voluntarily done, although unforeseen, unlooked for, unexpected, or disappointing, does not make the cause accidental. Shanberg v. Fidelity & Casualty Co. (C.C.A.8) 158 F. 1, 19 L.R.A.,N.S., 1206; Landress v. Phoenix Mutual Life Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, 90 A.L.R. 1382; Lincoln Nat. Life Ins. Co. v. Erickson, (C.C.A.8) 42 F.2d 997; Connecticut General Life Ins. Co. v. Allen (C.C.A.8) 64 F.2d 840; Pope v. Prudential Ins. Co. (C.C.A.6) 29 F.2d 185, 186. In the last-cited case it is said: 'There is obviously a substantial distinction between an accidental result and the result of an accidental cause.'" In that case, the insured was shot for making improper advances to another man's wife; on the ground that he had voluntarily created a situation fraught with danger to himself, the court held that his injuries were not received through accidental means.

In Massachusetts Bonding & Ins. Co. v. Richardson, Tex.Civ.App., 27 S.W.2d 921, 922, the policy provided: "This suit was filed by appellee against appellant to recover on an 'accident policy' in the sum of $2,000, issued by appellant to her deceased husband, Bill Richardson. This policy contained the following clause upon which she predicated liability: 'This policy insures against (1) the effects resulting directly and exclusively of all other causes, from bodily injury sustained during the life of this policy solely through External, Violent and Accidental means (excluding suicide, sane or insane).'" Construing the policy provision under the facts, this court said: "On a careful review of the entire statement of facts we have concluded that the testimony shows almost to a moral certainty that the deceased had abandoned his occupation of merchant tailor and for some months prior to his death and at the very time of his death was engaged in the business of bootlegging, and that he was killed while resisting arrest for bootlegging, and that at the very time he was killed he was engaged in his unlawful occupation, and that the officer shot and killed him in his necessary self-defense. The overwhelming weight and preponderance of the testimony was to the effect that the death of Bill Richardson was not the result of 'accidental means,' as that term was used in the insurance policy, but was the result of his unlawful assault upon the officer who killed him."

■ Appellee had the burden of alleging and proving that the death of her husband resulted from "accidental means." International Travelers Association v. Marshall, Tex.Sup., 114 S.W.2d 851. She undertook to discharge her burden by offering Garrett, the person who shot her husband, as her witness. As her witness, she was bound by his testimony. 17 Tex.Jur. 928. The rule has controlling force in this case, because Garrett's testimony was not contradicted nor impeached.

■ On the undisputed facts, it is our conclusion that Turner, by his conduct on the occasion in question, provoked the difficulty with Garrett under conditions which would have led a reasonably prudent man to believe that Garrett would shoot him if he continued the assault. Garrett was armed with a deadly weapon. He had the weapon in his hand, and pointing it at Turner, threatened to shoot him if he continued to advance. Notwithstanding the warning given by Garrett, under all the testimony Turner continued to advance, and Garrett shot him. There was no ground for the presumption by Turner that if a fight occurred between him and Garrett, it would be carried on without the use of the deadly weapon. "The injury followed in a usual or reasonably to be expected way from the means voluntarily employed" as that fact conclusion was construed by the Supreme Court in the Bryant case, supra, and therefore the conclusion follows that the death of Doc Turner was not the result of a bodily injury "sustained * * * solely through * * * accidental means."

Hutcherson v. Sovereign Camp, W. O. W., 112 Tex. 551, 251 S.W. 491, and American Nat. Life Ins. Co. v. Garrison, Tex.Civ.App., 97 S.W.2d 534, cited by appellees, are not in point. In the Hutcherson case, the evidence did not show that the insured knew that the party who shot him had a pistol. In the Garrison case, the

facts were sufficient to support the conclusion that the insured was shot and killed at a time when he was unaware of any such intent or purpose on the part of the person who shot him.

The judgment of the lower court in favor of appellee on the issues of double indemnity, attorney's fees, and penalty, is reversed, and here rendered for appellant. The judgment in favor of appellee and intervenor for the face of the policy is affirmed. The judgment denying appellant's "interpleader" is affirmed; there was no issue between appellee and intervenor as to the ownership of the proceeds of the face of the policy. The costs of the appeal will be taxed against appellee, Lillian Turner; the costs of the lower court against appellant.

Reversed and rendered in part, and in part affirmed.