**REPUBLIC NATIONAL LIFE INSURANCE COMPANY, Appellant,**

v.

**Mae Janette HAMILTON, Appellee.**

**No. 14143.**

Court of Civil Appeals of Texas.

San Antonio.

Oct. 23, 1963.

Rehearing Denied Nov. 20, 1963.

McGown & McClanahan, Philip E. Hamner, San Antonio, for appellant.

Groce & Hebdon, Richard Tinsman, San Antonio, for appellee.

MURRAY, Chief Justice.

Mae Janette Hamilton, appellee, was named as beneficiary in a group insurance policy issued by Republic National Life Insurance Company, appellant, on the life of Phillip M. Hamilton, her husband, hereinafter referred to as the insured, in the principal sum of $2,000.00 in case of his accidental death. Insured was found dead in his automobile on June 12, 1961, and appellee instituted this suit for the death benefits provided in the policy.

The trial was to a jury and resulted in judgment in favor of Mrs. Hamilton for the principal amount of the policy, together with penalty, attorney's fees and interest; from which judgment Republic National Life Insurance Company has prosecuted this appeal.

Appellant's first contention is that the trial court erred in refusing to grant its motion for an instructed verdict, since the undisputed evidence and appellee's own pleadings showed that the injury sustained by insured was not an accidental bodily injury; that it was voluntarily self-inflicted, and that under the circumstances he should

have reasonably anticipated that his deliberate act would result in injury or death.

The facts are that insured's body was found in his automobile, with the doors closed and locked from the inside and the windows rolled up, on June 12, 1961. His auto was parked at the San Antonio Municipal Airport. He lived at 302 Circle Street in Alamo Heights. Appellee had been out of town for six days and did not know of her husband's whereabouts. His body was lying on the back seat of the automobile, and a hypodermic syringe and a soda water bottle partially full of water were on the front seat. The auto was equipped with interior fresh air vents, of the type designed to provide a passageway for fresh air into the interior, although all the doors and windows are closed. When the body was discovered in the auto the airport security guard, a Mr. Tausch, called the San Antonio police. Investigating Officer Harry E. Hudgins arrived in a few minutes, and Tausch shattered a window of the car to gain access. Tausch said the motor had been cut off; that while the air on the outside was 100°, inside the car it seemed like 148°. Hudgins testified that the ignition switch of the car was on the off position when he entered the automobile.

Appellee testified that since the car had an air conditioner, the interior fresh air vents were kept closed. However, she admitted that she did not know whether these vents were open or closed when insured was found dead in the car, for she had been out of town for a week prior to the finding of his body. Henry Tausch, the airport guard, testified that from the outside everything was closed air tight, but admitted that he did not know whether the vents were open or closed. Officer Hudgins did not know whether the vents were open or closed. Detective Castillon, who arrived after the car had been opened, likewise did not know whether the vents were open or closed at the time the body was discovered.

Insured's body was removed from his car and taken to the Robert B. Green Hospital morgue by Detective Frank Castillon. The body was undressed by Castillon, who noted several needle marks on its left arm.

Dr. Robert Hausman, Medical Examiner for Bexar County, testified by deposition, that he examined the body of insured on June 13, 1961, the day after it had been discovered and brought to the morgue. He observed a quite recent needle mark leading into the vein of the left arm, and judged it to have been made within twenty-four hours before death. He had his toxologist analyze the urine and the bile from the body and also the contents of the syringe found in the car with deceased's body. The analysis resulted in a finding that the urine contained 42.4 milligrams of morphine per 450 milliliters; the bile contained 19.7 milligrams of morphine per 18 milliliters, and the syringe contained a minute amount of liquid which turned out to be heroin solution of high concentration. After heroin is injected into the system practically all of it breaks down into morphine. No other fluids, tissues or organs of the body were analyzed for morphine content, though the decomposed state of the body did not prevent such further analysis. Due to time and financial limitations, the medical examiner's office does not analyze these cases to that extent. Dr. Hausman did not know how full the syringe was when the injection was made, and did not know how much was injected. He did not know the amount of time which elapsed between the injection and death; he assumed that death had occurred a sufficient time after the injection for a maximum discharge into the urine and bile to have occurred. Based on the assumption that insured remained in a closed car, and the maximum discharge of morphine into the urine and bile had occurred before death, Dr. Hausman's opinion was that insured's injecting himself with more than 65 Mg. of heroin (1 grain) together with sitting in a closed car produced anoxia, causing his death. If there had not been sufficient time before death for a maximum discharge of the morphine from other parts of the body into the urine and

bile, then there would be a greater amount of morphine in other parts of the body. There could have been a great deal more heroin injected than one grain. Dr. Hausman did not think that insured had much more morphine in him than was found in the urine and bile. His basis for this conclusion was the type of death, that is death in a closed car. The exact amount of heroin injected could have been determined by analyzing for morphine content of the blood, the brain, the liver, the kidneys and possibly the fecal matter, which was not done in this instance.

Dr. Hausman testified that insured's death came about by a combination of the depressive action of heroin on the respiratory center, together with the lack of oxygen, caused by having breathed in a closed car prior to death. Dr. Hausman did not believe that the dose of heroin injected by insured alone would have produced his death, if it had not been for his sitting in a closed car which produced anoxia. Dr. Hausman testified that he did not examine the car and did not know of his own knowledge that insured died in a closed car. The narcotic was injected into the insured's body; it was not taken orally. To inject heroin solution into the body the plunger must be pushed after the needle is inserted in the vein. The solution will not flow out of the syringe into the body.

Heroin is a dangerous drug. It is not prescribed by physicians and is not available through medical channels or otherwise, lawfully, in the United States. It is one of the narcotics smuggled into this country for sale to addicts. It is one of the most powerful of narcotics. It is three times as powerful as morphine in its narcoting power. The lethal dose is not known, there being too much individual variation. Heroin causes respiration to become slow and artificial. It causes a sense of well-being. Insured was a large healthy young man in his twenties, and was not an addict. The effect of heroin is more pronounced upon a non-addict.

There was evidence by other experts that the injection of one grain of heroin into the body of a young man of insured's age and build, who was not an addict, would be within the lethal range. There was evidence that if a person sat in a car with the windows closed but with the fresh air vents open, there would be an exchange of oxygen and carbon dioxide through the open vents, so that the oxygen level outside the car and that inside would tend to keep in balance.

The policy of insurance herein involved provided that:

"If the Employee, as a result of accidental bodily injury, shall suffer, directly and independently of all other causes and within ninety days from the date of the accident, any of the losses described below, the Company will pay the amount specified for such loss in the following Schedule:

SCHEDULE

FOR LOSS OF AMOUNT PAYABLE

Life                The Principal Sum"

The principal sum in this case is $2,000.00.

The "EXCLUSIONS" provide:

"The insurance with respect to Accidental Death, * * * does not cover loss caused or contributed to by: * * *

"(d) suicide, or any attempt thereat, while sane or insane; homicide, intentional or unintentional."

■ The question here is, did Mrs. Hamilton discharge the burden resting upon her of showing that insured suffered an accidental bodily injury which "independently of all other causes" produced his death. *Combined American Ins. Co. v. Blanton,* 163 Tex. 225, 353 S.W.2d 847; *International Travelers Ass'n v. Francis,* 119 Tex. 1, 23 S.W.2d 282; *Tix v. Employers Casualty Co.,* Tex.Civ.App., 368 S.W.2d 105; *Spencer v. Southland Life Ins. Co.,* Tex.

Civ.App., 340 S.W.2d 335; Hanna v. Rio Grande Nat. Life Ins. Co., Tex.Civ.App., 181 S.W.2d 908.

■ There are a great many cases dealing with accidental death insurance, but the facts are never the same in any two cases, and therefore each case must be largely decided upon its own peculiar facts. Tix v. Employers Casualty Co., supra; Standard Life & Accident Ins. Co. v. Roberts, Tex.Civ.App., 318 S.W.2d 757; American Casualty Co. v. Jones, Tex.Civ.App., 146 S.W.2d 423; Worley v. International Travelers Assur. Co., Tex.Civ.App., 110 S.W.2d 1202; Metropolitan Life Ins. Co. v. Funderburk, Tex.Civ.App., 81 S.W.2d 132; Western Indemnity Co. v. MacKechnie, Tex.Civ. App., 214 S.W. 456.

■ It is clear that insured intentionally injected himself with heroin, which, after it entered his body, turned into at least 65 milligrams of morphine. There was no accident about this, and if his death was thus caused, it would not be the result of accidental means. Dr. Hausman, the County Medical Examiner who conducted an examination of insured's body the day after it was found, testified by deposition that in his opinion the combination of the injection of heroin and the breathing in a closed car produced the death of insured. Dr. Hausman assumed that insured's body was found in a closed car, and that he had not injected himself with more than 65 milligrams of morphine. In assuming these facts, Dr. Hausman was in error.

Neither the witness Henry Tausch, who discovered the body and broke into the car, nor Harry E. Hudgins, the police officer who was summoned to the scene, was able to testify whether or not the air vents under the dashboard were open or closed. No other witnesses were in a position to testify as to this fact. Mrs. Hamilton testified that, as the car was equipped with air conditioning, they kept these vents closed, but she had been out of town for a week prior to her husband's death, and did not know whether these vents were open or closed at the time of her husband's death. She did not testify that the vents were closed when she received the car after his death.

No one knew exactly how much time elapsed between the injection of the heroin and the death of insured. The only examination Dr. Hausman made to determine the amount of heroin injected into insured's body was a test of the urine and bile found in his body. If there had been sufficient time for all of the morphine to be discharged from other parts of the body into the urine and bile, this test would indicate the amount of heroin injected into insured's body, but if there had not been sufficient time for such discharge, then it would be necessary to examine other parts of the body to determine the amount of heroin injected.

The effect of Dr. Hausman's testimony was that if there had been no more heroin, or morphine, injected than he found in the urine and bile, and if insured had sat in a closed car after the injection, then it was this combination that produced his death.

Dr. A. O. Severance, a specialist in pathology, who was at least as well qualified as was Dr. Hausman, testified that 65 milligrams of morphine might produce death when injected into the human body. It could be regarded as a lethal dose for a person who was not an addict. Insured was not an addict. He further testified that if the vents of the car were open, oxygen would come into the car and carbon dioxide would go out of the car; the air outside the car would tend to keep in balance the air inside. This testimony was not contradicted by anyone, including Dr. Hausman.

■ Dr. Hausman's opinion as to cause of death carries no weight because it is based on hearsay, not shown to be the true facts. Aetna Ins. Co. v. Klein, 160 Tex. 61, 325 S.W.2d 376; Pitcock v. State, 168 Tex.Cr.R. 223, 324 S.W.2d 866; Pacific

Mut. Life Ins. Co. of Cal. v. Schlakzug, 143 Tex. 264, 183 S.W.2d 709; Office Emp. Intern. Union Local No. 129, AFL–CIO v. Houston Lighting & Power Co., Tex.Civ. App., 314 S.W.2d 315; National Sec. Life & Cas. Co. v. Benham, Tex.Civ.App., 233 S.W.2d 334; Traders & Gen. Ins. Co. v. Keahey, Tex.Civ.App., 119 S.W.2d 618.

■■ Even though insured's death was caused by the combination of the injection and anoxia caused by sitting in a closed car, the evidence shows that insured intentionally injected himself with heroin, a drug considered by physicians to be dangerous when used in the human body, and in fact a poison only obtainable in the black market. At least 65 mg. of morphine was found in his body, no one knows how much more it contained. This amount is considered a lethal dose by some physicians. Insured intentionally closed the windows and locked the doors from the inside. Neither the taking of the heroin nor the closing of the windows and doors of his car was an accident. The taking of the heroin and sitting in the closed car were calculated to produce death. There is no evidence as to whether insured knew this or not. Under all of the evidence it is just as reasonable to presume that he did as to presume that he did not. Under such circumstances, appellee failed to discharge the burden resting upon her of showing by probative evidence that insured did not know the danger involved in injecting himself with heroin and sitting in his closed car on a hot day in June. International Travelers' Ass'n. v. Bettis, 120 Tex. 67, 35 S.W.2d 1040; Langlitz v. American Nat. Ins. Co., Tex.Civ. App., 146 S.W.2d 484; American Nat. Ins. Co. v. Williams, Tex.Civ.App., 144 S.W.2d 662; Grosvenor v. Fidelity & Cas. Co., 102 Neb. 629, 168 N.W. 596; Carnes v. Iowa Traveling Men's Ass'n., 106 Iowa 281, 76 N.W. 683.

■ The mere fact that insured may not have intended to commit suicide does not establish that his death was "a result of accidental bodily injury," within the meaning of the insurance policy. Spencer v. Southland Life Ins. Co., Tex.Civ.App., 340 S.W.2d 335; Texas Prudential Ins. Co. v. Turner, Tex.Civ.App., 127 S.W.2d 563; Massachusetts Bonding & Ins. Co. v. Richardson, Tex.Civ.App., 27 S.W.2d 921; Thompson v. Prudential Ins. Co. of America, 84 Ga.App. 214, 66 S.E.2d 119, (playing "Russian Roulette"); Espinoza v. Equitable Life Assur. Soc., 345 Ill.App. 240, 103 N.E. 2d 149, (person engaging in gun duel); Baker v. Nat. Life & Acc. Ins. Co., 201 Tenn. 247, 298 S.W.2d 715, (an insured permitting another to shoot a can off his head with a revolver, accidentally shot); Allred v. Prudential Ins. Co., 247 N.C. 105, 100 S.E.2d 226, (insured voluntarily reclining on the highway).

■ Appellee failed to establish by probative evidence that insured's death was "a result of accidental bodily injury" and therefore cannot recover under the terms of the insurance policy. Accordingly, the judgment of the trial court is reversed and judgment here rendered that appellee take nothing and pay all costs of this and the trial court.